639 P.2d 12

Don E. COX, Plaintiff-Appellant,

v.

MOUNTAIN VISTAS, INC., an Idaho Corporation, and George C. Crandlemire, Defendants-Respondents.

No. 13326.

Supreme Court of Idaho.

Dec. 31, 1981.

John F. Varin of James, Hobdey & Varin, Fairfield, for plaintiff-appellant.

Bert Larson of Larson, McIntyre & Coleman, Twin Falls, for defendants-respondents.

McFADDEN, Justice.

The instant appeal involves an action to rescind a contract for the purchase of real property located in Camas County, Idaho. Plaintiff-appellant, Don E. Cox, sought rescission of the contract on grounds of fraudulent misrepresentation. Defendants-respondents Mountain Vistas, Inc. and George C. Crandlemire, answered, denying the claims of Mr. Cox and subsequently filed a counterclaim shortly before trial, alleging that Mr. Cox had failed to make the required payments under the terms of the contract and sought judgment for the balance due of $12,500, plus interest, costs and attorney fees. The district court dismissed with prejudice Mr. Cox's complaint and entered judgment on the counterclaim of Mountain Vistas, Inc. and Mr. Crandlemire for the balance due, plus interest and costs. We affirm.

The record discloses the following facts pertinent to this appeal.

In early December 1972, George Crandlemire, president of Mountain Vistas, Inc., approached Don Cox about a real estate project Mountain Vistas was developing in Camas County, Idaho, i.e., the Smoky Dome Ranchos Subdivision. Mr. Crandlemire explained to Mr. Cox that Mountain Vista [1] was developing a 160 acre tract of unimproved agricultural land [2] into subdivision

---

1. Mountain Vistas, Inc. is an Idaho corporation organized on June 6, 1972. However, its Articles of Incorporation were not filed in Camas County until October 1975.

2. The 160 acre tract which was to become Smoky Dome Ranchos Subdivision was purchased by Mr. Crandlemire, in his own name, from the A. M. Scoggin Trust pursuant to an installment land sales contract dated November 1, 1972. Immediately upon the property having been paid for in full, on November 18, 1977, title to the property was transferred to Moun-

of sixteen ten acre lots, with each lot deeded and to be accessible by a common roadway and provided with underground utility service. During the discussion Mr. Cox was shown a plat of the subdivision and informed that it had been approved by and recorded with the appropriate governmental bodies.[3] Mr. Cox expressed interest in the development, and entered into negotiations that same day for the purchase of two lots, numbers 5 and 9. The parties agreed to enter into separate installment land sales contracts for each lot, the terms of the contracts being identical except that one would be for lot 5 and the other for lot 9.

During 1973, Mountain Vistas sent Mr. Cox letters and newspaper clippings extolling the "Phenomenal Development in Unspoiled Camas County." In early September 1973 Mr. Cox first saw the property. At that time, no observable development work had been undertaken. He contacted the Camas County Recorder's office and learned that no plat for the property had been recorded. He resolved to confront Mr. Crandlemire about the lack of progress in developing the subdivision.

Mr. Cox met with Mr. Crandlemire in December 1973 and they discussed the project, including Mr. Cox's concern over the lack of development. Mr. Cox was reassured that development was forthcoming, and that Mr. Crandlemire was "hopeful" of putting in the common roadway and utility service hookups in the summer of 1974. Mr. Cox was also informed that a final plat of the subdivision had been recorded with the Camas County Recorder on September 12, 1973, which the record shows was true. Based upon Mr. Crandlemire's assurances, Mr. Cox paid the next installment on the land sales contract plus prepaid interest for 1974.

Mr. Cox visited the subdivision in August 1974 with his family. He noticed no new work had been undertaken on the property. Shortly thereafter he notified Mr. Crandlemire that he considered the contract to be

rescinded. Mr. Cox made no further payments on the contract.

After demand letters failed to effect a return of his payments, on March 10, 1975, Mr. Cox filed a suit for rescission of the contract. An answer was subsequently filed on behalf of the defendants by their first attorney. However, this attorney later withdrew on March 29, 1976, and another attorney was then retained by the defendants. A year later this attorney also withdrew. The matter was finally set for trial on August 22, 1978.

Shortly before the date set for trial, the defendants retained Mr. Larsen, their present attorney, to represent them. After reviewing the files and records in the matter, defendants' new attorney concluded that it would be necessary to file an amended answer and counterclaim. Upon defendants' motion, the trial date of August 22, 1978 was vacated and the court allowed the defendants leave to file an amended answer and the counterclaim.

The matter was tried on October 24, 1978. Subsequently, the district court issued a memorandum opinion, concluding that Mr. Cox's claim for relief was without merit, and that defendants Mr. Crandlemire and Mountain Vistas, Inc., were entitled to judgment on their counterclaim. Findings of fact and conclusions of law were thereafter made by the district court, and judgment accordingly entered. Plaintiff then perfected this appeal.

Appellant presents numerous issues on appeal, with primary emphasis being placed on several alleged decisional errors made by the district court in its memorandum opinion and subsequent findings of fact and conclusions of law, and secondary emphasis being placed on rulings made by the district court at the pretrial and trial stages of the instant case. This opinion will be subdivided according to the stages of the proceedings in which the challenged rulings and decisional errors were made by the district court.

tain Vistas. Mr. Crandlemire personally has never held legal title to the property.

3. The trial court found that this original plat had not been recorded, but that a very similar plat had been recorded on September 12, 1973.

PRE–TRIAL PROCEEDINGS: PRO-PRIETY OF VACATING TRIAL DATE OF AUGUST 22, 1978, AND ALLOW-ING AMENDED PLEADINGS.

In the proceedings below, respondents requested leave to amend their answer and set up a counterclaim over three years after the filing of the original answer. The request contained no allegations of oversight, inadvertance or excusable neglect. Appellant, relying principally on I.R. C.P. 13(f) argues that the failure to allege any of these grounds bars the respondents from seeking leave to amend their answer and set up a counterclaim. We disagree.

I.R.C.P. 13(f) provides:

"When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, *or when justice requires*, he may by leave of court set up the counterclaim by amendment." (Emphasis added.)

Thus, besides situations of oversight, inadvertence, or excusable neglect, a pleader may also seek leave of the court to amend an answer and set up a counterclaim "when justice requires" the amendment be allowed.

Furthermore, Moore, in his treatise, *Moore's Federal Practice*, § 13.13, at 13–846 (2d ed. 1980), states the purpose behind the identical federal rule as follows:

"Subdivision (f) will find its most useful application in the case of compulsory counterclaims. Inasmuch as a party could later be met successfully with a plea of res judicata in a suit on a claim within subdivision (a) which he had failed to plead, the courts should be very liberal in allowing amendments to include compulsory counterclaims, and even permissive counterclaims where no prejudice would result, where the pleader has not been guilty of inexcusable neglect, or has not by reprehensible conduct deprived himself of any claim to special consideration by the court."

Consonant with the above statement concerning Rule 13(f), are this court's repeated statements that "great liberality should be exercised in permitting amendments to pleadings in furtherance of justice between the parties." (*Markstaller v. Markstaller*, 80 Idaho 129, 134, 326 P.2d 994 [1958]; cited with approval in *Smith v. City of Preston*, 99 Idaho 618, 620, 586 P.2d 1062 [1978] ), and that this matter is entrusted to the sound discretion of the trial court (*Jones v. Watson*, 98 Idaho 606, 570 P.2d 284 [1977]; *Fajen v. Powlus*, 98 Idaho 246, 561 P.2d 388 [1977]; *Cady v. Keller*, 28 Idaho 368, 154 P. 629 [1916] ).

In the instant case, the recently retained counsel for respondents sought leave to set up a counterclaim through an amended answer four days prior to the scheduled trial date. The motion for leave to amend was accompanied by an affidavit of the respondents' counsel detailing the factual circumstances surrounding the delay in seeking leave to amend, concluding that "justice may not be accomplished" without leave to amend. The pertinent language from that affidavit is as follows:

"1. Affiant is a duly licensed and qualified practicing attorney in the State of Idaho.

2. On or about July 25, 1978, a friend of defendant, George Crandlemire, contacted affiant's office, in affiant's absence, and inquired as to whether or not the firm with which affiant is associated would undertake the representation of defendants.

3. Shortly after July 25, 1978, after reviewing certain papers left with affiant, affiant advised George Crandlemire to attempt to work out a compromise of the case with plaintiff's counsel, but those negotiations were unsuccessful.

4. On August 14, 1978, George Crandlemire contacted affiant's office by telephone, advised affiant of the inability to compromise the case and urged affiant to represent him in the case which had been set for trial before the court in Camas County to begin on Tuesday, August 22, 1978.

5. Affiant again reviewed the files and records left with affiant's office by George Crandlemire and concluded it

would be necessary to accomplish justice to file an Amended Answer and Counterclaim in the above-entitled action."

Additionally, a review of the proposed amended answer and counterclaim attached to the motion for leave to amend reveals that in no wise would it enlarge the issues already presented or precipitate the need for extended discovery.

In allowing the amended answer to be filed, the trial court impliedly ruled that no prejudice would result given the limited subject matter of the counterclaim so set up nor was there any reprehensible conduct on the part of the respondents given the factors underlying the delay in setting up the counterclaim. Under these circumstances, and the absence of any showing on the part of appellant to the contrary, the trial judge cannot be said to have abused his discretion in granting respondents' motion to amend their answer to set up the counterclaim against appellant.

TRIAL: ADMISSIBILITY OF TESTIMONY OF THIRD PARTIES CONCERNING TRANSACTIONS BETWEEN THEMSELVES AND RESPONDENTS.

The next issue to be considered is whether the trial court erred in allowing two witnesses to testify regarding their purchases of property in the Smoky Dome development from respondents. These purchases occurred several years after the transaction in dispute, and involved parcels of property in a subdivision adjacent to Smoky Dome Ranchos. The testimony elicited was for the purpose of showing that in these subsequent transactions all representations made by respondent Crandlemire were factual and true. For example, Elizabeth Claggett testified as follows:

"Q And are you owners, you and your husband, of any portion of Rancho Vistas, Smoky Dome Ranchos East?

A I guess it's east. We have Lot 24.

Q You have Lot 24?

A Ten acres.

Q In Smoky Dome Ranchos East?

A Uh-huh.

Q And when did you purchase that?

A In August of '75.

Q And prior to your purchase, did you inspect the property?

A Yes.

Q And through whom did you make the purchase arrangement?

A George Crandlemire.

Q And are you buying the property now on a contract?

A Yes.

Q And what was the total amount you agreed to pay?

A $15,000 for ten acres.

Q That is for a ten-acre plot?

A Right.

Q And in your conversations with respect to this Rancho, did you have conversations with Mr. Crandlemire?

A Before I bought it?

Q Yes.

A Yes.

Q And was the property as represented to you by Mr. Crandlemire?

MR. VARIN: Objection, Your Honor. I think this is irrelevant, far removed from time, from the time of the transaction in this case. And furthermore it's dealing with a piece of land that though adjoining is not part of the Smoky Dome Ranchos plot that we are concerned with.

THE COURT: Well, it may have some probative value upon the question of fraud. I assume that's part of what you are getting at?

MR. LARSON: Yes, Your Honor.

THE COURT: So the objection will be overruled. Go ahead.

Q (By Mr. Larson) Was the property as represented by Crandlemire?

A Yes.

Q Did he make any misrepresentations to you and your husband about the property?

A No."

The testimony of the other witness, Gary Richard Huntington, was to the same effect. Appellant contends that there is no relevancy in subject matter nor time between these subsequent transactions and

the instant transaction, and therefore the testimony of the two witnesses should have been excluded.

In *Allen Steel Supply Company v. Bradley*, 89 Idaho 29, 402 P.2d 394 (1965), the court recognized that ordinarily conduct of or transactions between third parties to the action is irrelevant as to the conduct of the party to the action. In *Allen*, the court upheld the trial court's ruling denying the admission of exhibits of transactions between one of the parties to the action and third parties because "the offered exhibits did not tend to prove or disprove facts relevant to the issues presented by the pleadings." 89 Idaho at 37, 402 P.2d at 398. Implicit in the court's ruling was that the exclusion was based on the ground that the transactions' relevancy had not been established, rather than the fact that they were collateral. Thus, if transactions with third parties are relevant to the action, evidence of the collateral transactions would be admissible under the reasoning of *Allen*.

■ In the instant case the evidence of the third party transactions as reflected in the testimony of the two witnesses does not render the inference more probable that respondent Crandlemire dealt truthfully with the appellant in making representations about the property than it would be without admission of the offered testimony. The trial court therefore erred in concluding that both witnesses' testimony may have probative value concerning the issue of fraud. Although the trial court erred in this regard, the error is harmless: the matter was tried to the court rather than a jury and the court specifically found that the alleged misrepresentations were not made

4. The court notes that neither of these challenged factual findings go to the core of this case. As recognized by the district court in its thorough memorandum decision, the main issue in this case is "the delay in the development of the property. This was [Cox's] basic reason for attempting to rescind the contract in 1974."

In connection with the development of the property, the district court made several findings of fact, all of which are substantiated by the record:

and in any event that there was no reliance thereon by the appellant.

DECISIONAL RULINGS: (1) DID THE DISTRICT COURT CORRECTLY CONCLUDE THAT APPELLANT'S CLAIM FOR RELIEF WAS WITHOUT MERIT.

■ The district court, in its findings of fact and conclusions of law, concluded as a matter of law "[t]hat the claim for relief sought by plaintiff, Don E. Cox, is without merit and the complaint may be and hereby is dismissed with prejudice." This conclusion of law is based in pertinent part upon Finding of Fact no. 11 made by the district court:

"In this case Cox seeks rescission of two real estate installment contracts on the grounds of misrepresentation. He has alleged five specific misrepresentations in his complaint. The first is that the property was owned by Mountain Vistas, Inc. in fee simple as of December 15, 1972. The court has found as a factual matter that this representation was not made. In any event, the issue was not a material factor in Cox's decision to purchase the property. The second alleged misrepresentation was that the land was platted and recorded as of the date of the contracts. This unquestionably was not true. However, Cox learned the true state of facts in September 1973, and proceeded to pay the installment payment for the forthcoming year. Cox was not damaged by that misrepresentation. . . ."

Appellant argues that the district court erred in concluding that his claim for rescission was without merit for the reason that the above factual findings are erroneous.[4] We disagree.

"5. Cox first saw the property in early September 1973. At that time, no observable development work had been done. He contacted the Camas County Recorder's Office and learned that no plat for the property had been filed. He resolved to confront Crandlemire later in Hawaii about the lack of development work.
6. Cox met with Crandlemire in Hawaii in December 1973 and they discussed the project, including Cox's concern over the lack of development. Cox wanted Crandlemire to buy the lot back but Crandlemire

It would unduly lengthen this opinion and serve no salutory purpose to enter into a discussion of the evidence supporting the two factual findings of the district court being challenged on appeal. Suffice it to say that a careful and thorough examination of the record discloses that the challenged factual findings entered by the district court in this respect are based upon competent and substantial evidence. This court has held on numerous occasions and uniformly applied the rule in cases involving the issue of fraud that findings of fact supported by competent and substantial evidence, although conflicting, will not be disturbed on appeal. *Faw v. Greenwood*, 101 Idaho 387, 613 P.2d 1338 (1980); *Smith v. King*, 100 Idaho 331, 597 P.2d 217 (1979); *Shrives v. Talbot*, 91 Idaho 338, 421 P.2d 133 (1966); *Paffile v. Sherman*, 84 Idaho 63, 368 P.2d 434 (1962).

> declined. Cox was reassured that development was forthcoming and paid the 2nd installment plus prepaid interest for that year ($3,500, see exhibit 16). As stated in exhibit 12, Crandlemire at that time was 'hopeful' of putting in the horseshoe loop, and underground electricity and telephone hook-ups in the summer of 1974.
> 7. Cox next visited the land in August 1974 with his family. He noticed no new work done on the property except for certain green stakes which may have been surveying stakes. He then checked with the planning commission and Camas Abstract Company, and contacted counsel. Shortly thereafter, he notified Crandlemire that he considered the contract to be rescinded. Cox has made no further payments on the contract, and no demand has been made upon him for payment prior to the filing of the counterclaim herein."

As a very general principle, it is reasonable that a person who has entered into an installment agreement for the purchase of a parcel of real property in a proposed subdivision might be expected to back away from the transaction upon discovering that there is little faith to be placed in a seller-developer's reassurances that improvements would be forthcoming. And ordinarily where those reassurances arise to the level of oral misrepresentations there would be a basis for equitable relief from the written agreement, assuming the presence of the other elements.

However, the district court, in disposing of the issue of lack of development, observed in finding of fact no. 11:

The appellant further contends on appeal that the district court erred in concluding that appellant's claim for rescission of the contract was without merit for the reason that the conveyance was illegal because respondents had not complied with the statutory provisions in this State governing the recording of subdivision plats. I.C. § 50–1301 *et seq.* Specifically, appellant draws the court's attention to I.C. § 50–1316, which provides:

> "Any person who shall dispose of or offer for sale any lots in any city or county until the plat thereof has been duly acknowledged and recorded, as provided in sections 50–1301 through 50–1325, shall forfeit and pay one hundred dollars ($100) for each lot and part of a lot sold or disposed of or offered for sale."

The trial court found, and respondents concede, that at the time of the sale of the realty in question, the plat of the Smoky

> "The contract makes no mention of a time table for development. It does state that Crandlemire retains grazing and haying rights for the years 1973 and 1974 and also that Crandlemire would pay the property taxes for those years. This is entirely consistent with the absence of visible development in the first two years. In addition, the letter from Crandlemire to Cox dated 12/23/72 (exhibit 5) states: 'Give it and me five years and I feel this will prove to be one of the best investments you ever made.' Under the circumstances, the Court believes that the delays in development were contemplated by Cox at the outset."

(Although the issue was not raised by the pleadings, it is to be noted that the district court did not err in ruling on the issue since the parties expressly raised it at trial. *See* I.R.C.P. 15(b).)

A review of the record raises a question as to the sufficiency of the evidence in support of the foregoing portion of finding of fact no. 11. However, the appellant did not present any such issue on appeal. The rule of law is well-settled in this state that a trial court's findings of fact to which the appellant has not specified as an issue, i.e., assigned as error, will not be considered on appeal. *Mollendorf v. Derry*, 95 Idaho 1, 501 P.2d 199 (1972); *Lockridge v. Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of America*, 93 Idaho 294, 460 P.2d 719 (1969). Accordingly, the question of sufficiency of evidence underlying the trial court's finding relative to the issue of lack of development will not be considered.

Dome Ranchos subdivision had not been recorded with the Camas County Recorder. Inasmuch as respondents' failure to record the plat is proscribed by I.C. § 50–1316, appellant argues that the contract having been based upon the unfiled plat the contract must therefore be deemed void. As previously pointed out, however, a similar plat was recorded, on September 12, 1973, as the district court found.

The holdings of this court in cases presenting the question of illegality of contracts because of a violation of a statutory provision generally have followed the rule advanced by appellant that where certain acts or omissions are expressly proscribed by statute, contracts based on such acts or omissions are void. *See, Wheaton v. Ramsey*, 92 Idaho 33, 436 P.2d 248 (1969); *Whitney v. Continental Life & Accident Co.*, 89 Idaho 96, 403 P.2d 573 (1965); *Messerli v. Monarch Memory Gardens, Inc.*, 88 Idaho 88, 397 P.2d 34 (1964); *Hancock v. Elkington*, 67 Idaho 542, 186 P.2d 494 (1947); *Goranson v. Brady-McGowan Co.*, 48 Idaho 261, 281 P. 370 (1929); *McKinlay v. Javan Mines Co.*, 42 Idaho 770, 248 P. 473 (1926); *Ashley & Rumelin v. Brady*, 41 Idaho 160, 238 P. 314 (1925); *Metz v. Jones*, 39 Idaho 330, 227 P. 591 (1924); *McFall v. Arkoosh*, 37 Idaho 243, 215 P. 978 (1923); *Zimmerman v. Brown*, 30 Idaho 640, 166 P. 924 (1917). However, in the case of *Gallafent v. Tucker*, 48 Idaho 240, 281 P. 375 (1929), the court refused to extend the terms of a statute to void a contract unless such a result was within the intent of the legislative body. In finding no such legislative intent, the court in *Gallafent* observed that:

"The rule of interpretation to be followed is that the question is one of legislative intent, and the courts will look at the language of the statute, the subject matter of it, the wrong or evil which it seeks to remedy or prevent, and the purposes sought to be accomplished in its enactment; and, if from all these it is manifest that it was not intended to imply a prohibition or to render the prohibited act void, the courts will so hold and will construe the statute accordingly." 48 Idaho at 244, 281 P. at 376.

Two recent cases from other jurisdictions have considered similar questions to those presented in the instant appeal concerning illegality of contracts because of a statutory violation, and are in accordance with the views expressed in the *Gallafent* case.

In *Marriott Financial Services, Inc. v. Capitol Funds, Inc.*, 288 N.C. 122, 217 S.E.2d 551 (N.C.1975), the North Carolina Supreme Court held the legislative body did not intend to invalidate conveyances of real property due to the failure of a vendor to follow the provisions of an ordinance making it a misdemeanor to convey property without previously securing city approval of a subdivision. In so holding, the court set forth a particularly well reasoned analysis:

"We look to the language of the enabling act and the city ordinance to ascertain the intent of the legislative bodies. The preamble to Chapter 921 of the 1955 Session Laws indicates that the purposes of the legislation are to prevent urban blight; to discourage the inefficient and inappropriate uses of lands; to deter the creation of conditions which require excessive expenditures for municipal facilities, services, and maintenance; . to promote the efficient and wise use of land and the orderly growth of cities and towns by requiring that new subdivisions 'be designed in accordance with reasonable standards and comprehensive plans for the growth of the urban areas'; and to provide an adequate means by which the City of Raleigh may effectuate these aims. Such protective legislation must be construed 'so that it does not become just another hazard for the unwary.' *In re Estate of Peterson*, 230 Minn. 478, 42 N.W.2d 59. Pursuant to the ordinance, anyone who describes any land in a deed by reference to a subdivision plat which has not been properly approved and recorded is guilty of a crime, punishable as a misdemeanor. The offense is expressly designated, and punishment for its violation clearly stated. The General Assembly has carefully designated the offense, the offender, and the penalty and has made specific provisions to insure en-

forcement. The inference is 'that the legislature has dealt with the subject completely and did not intend, in addition thereto, that the drastic consequences of invalidity should be visited upon the victim of the offender by mere implication.' To hold that the enactment, either expressly or by plain implication, indicates a legislative intent to invalidate the sale of property absent compliance with the subdivision ordinance would visit upon the unfortunate purchasers 'a penalty far greater than, and out of all proportion to, the penalty imposed upon the wrongdoer himself.' *In re Estate of Peterson, supra.*" 217 S.E.2d at 559–560.

Similarly in the case of *Gilmore v. Hershaw,* 83 Wash.2d 701, 521 P.2d 934 (1974), the Washington Supreme Court upheld the trial court's dismissal of an action for rescission of real estate contracts based upon an allegation that the vendors had not complied with certain provisions of a statute relating to the platting of subdivisions. In affirming the dismissal, the court reasoned that:

"[A]n expression of one thing in a statute excludes others not expressed. *State v. Thompson,* 38 Wash.2d 774, 232 P.2d 87 (1951). While specifically allowing the appropriate public authority to recover a civil fine for the sale of unplatted land, or optionally, to seek an injunction against such sale, this pre-1969 chapter did not provide a remedy of rescission to the vendee of unplatted land. Such a remedy is, therefore, excluded by implication. Nor did the chapter make the sale of such land void or illegal so as to give the vendee a common law remedy of rescission. Whether the omission of such a provision is the product of inadvertence or intention, the fact remains that the chapter lacks such a provision. The court cannot read into a statute anything which it may conceive that the legislature has unintentionally left out. *Department of Labor and Industries v. Cook,* 44 Wash.2d 671, 269 P.2d 962 (1954); *Seattle Ass'n of Credit Men v. General Motors Acceptance Corp.,* 188 Wash. 635, 63 P.2d 359 (1936). Thus, these appellants have no common law right to rescission." 521 P.2d at 935–36.

The court is mindful that there exists case law from other jurisdictions, most notably California, which appear to take a differing position than the one advanced in the above cases. *See, e.g., Hartzwell v. Doolittle,* 205 Cal. 17, 269 P. 527 (1928); *Smith v. Bach,* 183 Cal. 259, 191 P. 14 (1920); *Downing v. Ringer,* 7 Mo. 585 (1842). However, later cases in these jurisdictions indicate that the contract may not be absolutely void. *See City of Thiburon v. Northwestern Pac. R. R.,* 4 Cal.App.3d 160, 84 Cal.Rptr. 469 (1970); *Munns v. Stenman,* 152 Cal.App.2d 543, 314 P.2d 67 (1957); *Sharp v. Richardson,* 353 Mo. 964, 182 S.W.2d 151 (1944). A detailed discussion of these cases is unnecessary since we decline to follow them insofar as they hold that contracts such as the one in issue here are void.

Pursuant to I.C. § 50–1316, anyone who sells or offers for sale lots of an unrecorded subdivision plat is subject to a forfeiture of $100.00 for each lot or portion thereof sold or offered for sale. The language of the provision does not prohibit the act, *i.e.* the sale of lots of an unrecorded plat, nor does the provision mandate that the vendor must record the plat prior to contracting for the sale of the realty. The only mandate envisioned by the terms of the provision is the forfeiture of a set sum if the vendor contracts for the sale of the realty without first acknowledging and recording the plat.

We therefore hold, in accordance with the more recent line of authority from other jurisdictions that the legislature has dealt with the subject completely and did not intend to invalidate contracts for the sale of realty because of the vendor's failure to record the plat to lots or portions thereof sold or offered for sale. The trial court correctly ruled that the contract was not subject to rescission.

DECISIONAL RULINGS: (2) DID THE DISTRICT COURT CORRECTLY CONCLUDE THAT RESPONDENTS WERE ENTITLED TO JUDGMENT ON THEIR COUNTERCLAIM.

Finally, appellant presents two issues on appeal concerning the district court's entry of judgment in favor of respondents on their counterclaim for the balance due under the contract, interest and costs. The initial issue presented is merely a recapitulation of the last issue considered in this opinion. That is, appellant argues that the district court erred in granting respondents' counterclaim for the reason that the contract was unenforceable because the respondents had not complied with the statutory provisions in this state concerning the recording of plats. Inasmuch as we have already held that the failure to record the plat did not render the land sale contract void, any further discussion of this issue is unnecessary.

The appellant also contends that the respondents' failure to provide him notice of default prohibited the district court's ruling in favor of the respondents on their counterclaim. At the time the counterclaim was filed it is undisputed that the appellant was in breach of the contract by failing to pay over the installments on the contract as they became due after 1974.[5] It is also undisputed that the respondents failed to object to such nonpayment or give notice of default prior to filing their counterclaim. Additionally, the contract expressly required such notice to effect a forfeiture.

Under these facts, the appellant directs the court's attention to the case of *Fajen v. Powlus*, 98 Idaho 246, 248, 561 P.2d 388, 390 (1977), wherein this court held that "[f]ailure to give a required notice waives strict performance of the contract as to all inadequate payments and until such time as adequate notice of default is given." In so holding, the court relied on the well-settled proposition of law that:

> " 'Where a contract for sale of real estate makes time of the essence, and

provides for a forfeiture of the vendee's rights for failure on his part to make payments at certain times, a continued course of conduct on the part of the vendor in failing to declare a forfeiture, thereby leading the vendee to believe that the vendor waives strict compliance with the terms of the contract, works a waiver of the vendor's right to declare a forfeiture, unless and until he gives intention to do so, and a reasonable opportunity to make the delinquent payments.' *Sullivan v. Burcaw*, 35 Idaho 755, 763, 208 P. 841, 842 (1922)." *Fajen*, 98 Idaho at 248, 561 P.2d at 390.

The appellant's reliance on *Fajen* and the foregoing proposition of law is misplaced. The counterclaim set up by the respondents does not attempt to effect a forfeiture. Rather, the counterclaim was in the form of an action to recover installment payments due and owing under the contract. In such circumstances a demand for performance is not always necessary before an action may be had for the purchase price:

> "Where the covenants to convey and to pay are dependent, the vendor cannot maintain an action for the purchase price unless he has demanded the price before suit, although the contract for the price has been assigned, and although the contract rests in parol. *It has been held, however, that a demand before suit is not necessary where the time for payment is fixed in the contract. Although the purchaser has been in default, a vendor is not required to demand payment where the action is not to forfeit or rescind the contract, but to recover payments, due thereunder, and final payment does not become due until just about the time the action is commenced."* 92 C.J.S., Vendor & Purchaser § 481 at 461 (1955). (Emphasis added.)

---

5. It is to be noted that there was no acceleration clause in the contract. The respondents' counterclaim, filed on August 17, 1978 sought the entire unpaid balance of $6,250 per lot, a total of $12,500. However, at the time the counterclaim was filed, the final installment payment on each contract was not yet due. Those payments were not due until December 10, 1978. Therefore, in the absence of an acceleration clause, at the time the respondents filed their counterclaim, they were not entitled to a judgment for the entire unpaid balance. The entire balance was due, however, on March 13, 1979, when the district court entered judgment. The propriety of this matter not being raised by the parties, the court merely notes it in passing.

■ In the instant case, the contract provided that payment on each lot was to be made in six yearly installments of $1,250, beginning on December 10, 1973. The first installment was paid in 1973, but thereafter no payments have been made by the appellant. The time for payment being fixed in the contract, and the counterclaim not being in the form of an action to forfeit or rescind the contract, the court is of the opinion that a demand for payment of the installments due and owing was unnecessary prior to the respondent's filing their counterclaim. The filing of the counterclaim itself constituted sufficient demand.

Dismissal of complaint and judgment of the district court is affirmed. Costs to respondents. Requests for attorney fees denied.

DONALDSON, J., concurs.

BAKES, C. J., and SHEPARD, J., concur in the result.

BISTLINE, Justice, concurring and dissenting.

## I.

The body of the Court's opinion [1] sets forth a portion of Finding No. 11—which disposed of two of the allegedly actionable misrepresentations—but which in turn the Court does not discuss at all. I agree that under the circumstances of the case those two allegations were not actionable when relied upon by Cox in framing in his complaint. Such representations, assuming the record compels a finding that they were made, became inactionable when Cox, after learning the true state of facts, elected to continue with the transaction. Having so elected, Cox surrendered also his position to argue the applicability of I.C. § 50–1316, discussed at length in the Court's opinion.

## II.

I also agree with the Court's conclusion that Mr. Larson, as Crandlemire's newly retained counsel, was not improperly allowed to amend the answer four days prior to the scheduled trial date and assert a counterclaim. Although other trial judges would likely have ruled otherwise, see Cougar Bay Co. v. Bristol, 100 Idaho 380, 597 P.2d 1070 (1979), it was a discretionary situation, and a judgment call.

## III.

My primary concern with the Court's opinion is its failure to decide what I perceive to be the real issue in this case. The Court states: "As recognized by the district court . . . the main issue in this case is 'the delay in the development of the property. This was [Cox's] basic reason for attempting to rescind the contract in 1974.' " However, despite the fact that the Court candidly admits "[a] review of the record raises a question as to the sufficiency of the evidence" to support the trial court's conclusions on the issue of development, the Court declines to address this issue because it was not assigned as error.

This Court, however, has not always insisted on technical compliance with the appellate rules, especially in cases in which the issues are somehow, though perhaps inadequately, presented. In fact, this Court has on occasion sua sponte raised what it perceived to be a dispositive issue where that issue was not even addressed by the trial court or made a special assignment of error. For a recent and outstanding example, see Lamb v. Robinson, 101 Idaho 703, 620 P.2d 276 (1980), in which the Court went to such an extreme that I was unable to agree. But many are the times the Court has, and I think properly, discussed issues presented even when by oversight or inexperience no specific assignment has been made.

In this case, the trial court did address the issue of development and in fact, declared it to be the main issue in the case. Furthermore, on appeal the appellant in his

1. The primary and critical issue on appeal is set forth and discussed in footnote 4 of the Court's opinion.

opening brief's statement of facts immediately pursued it further:

"Mr. Cox was led to believe the development of the Subdivision had already begun and MVI would complete the subdividing of the entire tract, including cutting in a horseshoe road and placing undergound [sic] electric and telephone cables to each Rancho Lot, during the summer of 1973.

.    .    .    .    .

"During 1973, the Defendant, Crandlemire sent the Plaintiff letters and newspaper clippings which extolled the 'Phenomenal Development in Unspoiled Camas County'. When Plaintiff visited his Ranchos in September of 1973, he found that Defendant, Crandlemire's description, like many of the representations he had made before the parties entered into their Agreements, had a certain ring of truth about it: Smokey Dome Ranchos did indeed remain virtually 'Unspoiled'. There was no horseshoe road cut, and there were no telephone and electrical cables laid. In fact, there was no apparent development of the Ranchos whatsoever. . . .

"Plaintiff visited Defendant, Crandlemire, in his Honolulu, Hawaii, office in December of 1973. Defendant, Crandlemire, was unable to offer satisfactory excuses for his failure to complete the development by the summer of 1973, as promised. . . . He promised to correct the remaining defects, however, by early spring, 1974.

.    .    .    .    .

"In November of 1974, Plaintiff again visited the Smokey Dome Rancho property. Still, absolutely none of the promised developments had taken place. Accordingly, Plaintiff obtained legal counsel, and when Demand Letters failed to effect a return of his payments, filed this suit for rescission of the Contracts, based on fraud and selling a lot of an unrecorded plat."

The appellant, it is true, did not in the argument portion of his brief engage in any additional discussion on the issue, but surely must have thought—as I do—that very little more, if anything, needed to be said in this regard—for the very reasons set out by the Court in footnote 4. Thus, although the appellant's arguments on this issue are not verbose, it cannot fairly be said that the Court's attention was not brought to a consideration of this issue. For a proper and responsible determination of this case, that issue cannot be ignored.

Accept if you will, and as we must, that Cox entered into an agreement for the purchase of a platted lot, and that the plat itself, which was attached to the agreement as Schedule B and specifically referred to in the agreement, shows a road to the lots which Cox purchased. That fact—and the fact that Cox visited the property after the passage of two years' time and found no roads whatever to the lot which he had purchased—makes it hardly remarkable that Cox, as might any other reasonably minded person, felt justified in telling Crandlemire to take back his lot and sell it to someone else.

The Court to a limited extent in footnote 4 does discuss this issue by the expedient of setting forth the trial court's unsupported statement that it believed "the delays in development were contemplated by Cox at the outset." The trial court predicated this finding as to Cox's initial contemplation on the premise that "the *contract* makes no mention of a timetable for development." (Emphasis added.) It is at once obvious that if the contract itself had provided a timetable, and that timetable were not met, Cox's action would have been predicated on the easier theory of rescission for breach of an unfulfilled contractual promise of performance. Furthermore, the fact that no time table for development was set forth in the contract in no way suggests that the trial court considered the independent representations made by Crandlemire with regard to the development of the horseshoe loop and the utilities.

More to the point, the trial court placed heavy emphasis on what is apparently an annual Christmas letter which Crandlemire sent out to *all* of his lot purchasers. The

first of such letters, sent out December 23, 1972, stated:

"Dear SDR Owner,

Good seeing all of my past customers and friends last trip and meeting the few new ones that purchased a Rancho.

I feel the Smoky Dome area has the potential of being Americas next 'Super' ski meca, and I intend to hang right in there and promote it until it does. Give it and me five years and I feel this will prove to be one of the best investments you ever made.

If you can come by for a visit, (Idaho) try and make it Jan., Feb., March or July and August, this way I can give you a personal tour, am sure you will be as excited as I am. Write me either in Hawaii or at P. O. Box 902, Sun Valley, Ida. 83353.

Best of luck in 1973.

Sincerely,

/s/ George Crandlemire"

Nothing, of course, is found therein even suggesting any thought that the lot purchasers had agreed, or were somehow thereby obliged, to extend time—either a reasonable amount or whatever Crandlemire had in mind—for completion of roads which would provide access to the lots he had platted and sold. The letter in explicit terms refers to development of the Smokey Dome area as a "ski mecca," but in no way deals with or even mentions the horseshoe loop road or the underground utilities. Yet the trial court relied on the letter of December 23, 1972, to support its conclusion that "the delays in development were contemplated by Cox at the outset." Further discussion is not needed to cover the proposition that Crandlemire's subjective pre-Christmas unilateral statements of prognosis are not controlling as against that which he by his own mouth admitted representing to Crandlemire.

The trial court in finding 6 candidly stated: "As stated in exhibit 12, Crandlemire *at that time* [December of 1973] was 'hopeful' of putting in the horseshoe loop, and underground electricity and telephone hook-ups in the summer of 1974." This finding clear-

ly does not speak to the representations made by Crandlemire *at the time the agreement was signed*, nor does it suggest that the trial court ever considered that issue.

As to what was represented when Crandlemire induced Cox to enter into the purchase agreement, one need only look at the testimony to obtain the full picture. Crandlemire testified:

"I simply told Don Cox what I was doing in this country and with this property and the utilities that I would put in and the road that I would put in and the purchase of the whole thing and as a real nice recreational project you could use part of the year, maybe when you are hunting and fishing." Tr. at 111.

Cox, however, had affirmatively testified that at the time the agreement was signed Crandlemire stated he was going to start development of the horseshoe loop and the underground utilities during the winter of '72–'73 or the following summer, and that Crandlemire showed him the plat that was attached to the contract as Schedule B and which displayed the horseshoe loop and the entrance or accesses to the corner lots. Tr. at 14–15, 30. This testimony was not contradicted by that of Mr. Crandlemire, but *was* corroborated, other than as to the promised time sequence, which Crandlemire did not in the least contradict. Therefore, not only is the evidence insufficient to support the trial court's finding that "delays in development were contemplated by Cox at the outset," but *uncontradicted evidence* in the record is that Crandlemire *did* represent that he would develop the horseshoe loop and underground utilities during 1972 and 1973.

The trial court's failure to consider Crandlemire's representations as to the horseshoe loop and utilities made at the time of the agreement, together with the trial court's admission of irrelevant third party testimony, *see* part IV, *infra*, is error which requires reversal. Cox was entirely justified in rescinding as he did. The promises to put in the road and utilities could not be considered mere "puffing" because they would be *statements of fact entirely within*

*the control of Crandlemire*, not merely expressions of opinions.[2]

### IV.

Although I agree with the Court's conclusion that the testimony of Elizabeth Claggett and Gary Richard Huntington was irrelevant, and that *Allen Steel Supply Co. v. Bradley*, 89 Idaho 29, 402 P.2d 394 (1965), is one of many cases which brings it to the proper result, I am indeed troubled with where the Court then goes. My concern is that the Court may be making very bad law when it goes on to say:

"In the instant case the evidence of the third party transactions as reflected in the testimony of the two witnesses does not render the inference more probable that respondent Crandlemire dealt truthfully with the appellant in making representations about the property than it would be without admission of the offered testimony. The trial court therefore erred in concluding that both witnesses' testimony may have probative value concerning the issue of fraud."

Frankly, I confess to not understanding the first sentence.

I believe that totally irrelevant, incompetent, and immaterial to the issues raised by Cox's rescission of his transaction with Crandlemire is the testimony of the witnesses Claggett and Huntington that they had no complaint as to treatment received from Crandlemire in transactions which took place *not only* "several years after the transaction in dispute" (as the Court's opinion says) and involved properties in another subdivision, *but also in point of time following Cox's filing of suit*. Claggett and Huntington may indeed have fared very well in dealing with Crandlemire. Cox himself had nothing but kind words for Mr. Crandlemire, but he didn't want to go ahead on a transaction to purchase a property to which he could not drive—notwithstanding that the recorded plat showed a road, and his testimony that roads were promised, but not delivered.

I also cannot agree that the error in allowing in such testimony was harmless. I do not know of any rationale under which this Court can say that it may not have met its intended mark in influencing the trial court to the belief that Crandlemire was a man who simply did not misrepresent. The testimony bore fruit in that, as the Court puts it, the trial court "specifically found that the alleged misrepresentations were not made and in any event that there was no reliance thereon by the appellant [Cox]." The Court apparently sees the error as harmless because it was a judge, not a jury, being influenced by the character testimony. I also fail to comprehend that rationale. The trial judge obviously believed that it was admissible competent evidence or he would not have allowed himself to hear it.[3]

---

2. The representations made by Crandlemire that he would put in the road and the utilities are clearly distinguishable from his representation that the area would become a "ski mecca." Predictions as to future events not within control of the party are generally regarded as expressions of opinions, or "puffing," on which there is no right to rely and on which there is no right of action. *Sharp v. Idaho Investment Corp.*, 95 Idaho 113, 122, 504 P.2d 386, 395 (1975).

   The district court in this case found: "The third misrepresentation that the area was soon to be a part of a large scale development was not likely to have been false in Crandlemire's mind when he made it (as attested to by the newsclipping in evidence), and was 'puffing' of the sort Mr. Cox had ample sophistication to deal with." While this finding insofar as it goes may be without fault, it does not address what I perceive to be the dispositive issue in the case. The trial court did not make any specific finding on whether at the time the parties entered into the contract, Crandlemire made representations with regard to the horseshoe loop road and the underground utilities— the construction of which *was* within Crandlemire's control.

3. The judge himself expressed doubt as to his ability to put out of his mind inadmissible evidence once he had seen it. During direct examination of Crandlemire by Mr. Varin, Cox's attorney, Mr. Varin sought to question Crandlemire with regard to a letter sent to Crandlemire by Mr. Varin on behalf of Cox. Crandlemire's attorney objected to the admission of the letter on the grounds that the letter was a part of negotiations for the settlement of the case. Mr. Varin responded by stating that the purpose of his questions was to establish when the contract was rescinded. The trial judge then

Furthermore, he gave no intimation that he did not consider the testimony of Huntington and Claggett. Moreover, in considering whether their testimony was harmless or harmful, it must be kept in mind that extremely able counsel who introduced the evidence did not believe himself to be spending his client's money without a sincere belief that that evidence would have an impact upon the court's decision-making process. (Perhaps trivia, but the bringing of these two witnesses to testify against Cox's claim added approximately $300.00 to the cost bill Cox will have to pay.)

## V.

Finally, I cannot agree that Crandlemire's judgment on his counterclaim should be affirmed. Absent the Court pointing out some distinguishing feature which sets this case apart from *Stockmen's Supply Co. v. Jenne,* 72 Idaho 57, 237 P.2d 613 (1951), cited by the Court in *Singleton v. Foster,* 98 Idaho 149, 559 P.2d 765 (1977), in an opinion by Shepard, J., and relied upon and quoted in a concurring opinion by Bistline, J., those cases should control the decision on the issue of Crandlemire's failure to give any notice of default.

" 'By the terms of the written contract, if respondent Company wanted by reason of her default in the payments, to end and conclude her right to purchase, it had to give notice, which respondent Company never alleged it did and made no attempt to prove it did, and the record discloses beyond peradventure of a doubt that no such notice was given or forfeiture declared as recited in the written contract.' *Stockmen's Supply Co.,* 72 Idaho at 62, 237 P.2d at 617."

asked the parties to proceed without introducing the letter, if possible, and stated:
"That's what [Cox] has testified to. I am not saying it's binding on Mr. Crandlemire that's rescinded. I think it takes a lot of things for recision, but I guess the reason for my comment I hate to read anything, I am a human being, and I don't want to read anything that might tend to influence me one way or the other. And if I read to determine if it's admissible, I haven't got an erasure up there."

*Singleton v. Foster,* 98 Idaho at 152, 559 P.2d at 768.

Following reversal, remand, trial resulting in favor of the Singletons, and a second appeal, this Court, after quoting a notice of default provision similar to that used in this transaction,[4] upheld the trial court, saying:

"[I]f the Fosters or their assignee desired to exercise the default provisions of the contract, they needed only to mail such notices by certified mail to that address of the Singletons as stated in the contract." *Singleton v. Pichon,* 102 Idaho 588, 589, 635 P.2d 254, 255 (1981).

Shortly after the first (1977) *Singleton* case, this Court, citing it and *Stockmen's Supply,* held that "[f]ailure to give a required notice waives strict performance of the contract as to all inadequate payments and until such time as adequate notice of default is given." *Fajen v. Powlus,* 98 Idaho 246, 248, 561 P.2d 388, 390 (1977). In *Fajen,* the Court set forth as authority for the preceding holding, a proposition of law which is, or was until today, as honored by time as any holding this Court has ever announced:

" 'Where a contract for sale of real estate makes time of the essence, and provides for a forfeiture of the vendee's rights for failure on his part to make payments at certain times, a continued course of conduct on the part of the vendor in failing to declare a forfeiture, thereby leading the vendee to believe that the vendor waives strict compliance with the terms of the contract, works a waiver of the vendor's right to declare a forfeiture, unless and until he gives the vendee reasonable notice of his intention

4. The default provision in the contracts in this case provides:
"TIME OF THE ESSENCE"
"It is agreed that time is of the essence of this contract and if Buyer should, for any reason, fail or refuse to comply with the terms hereof, the Sellers have the option, *with Sixty (60) days notice to Buyer,* to terminate this agreement and retake possession with all payments forfeited as a reasonable rental value of said property and for time and expenses of said agreement. (Emphasis added.)

to do so, and a reasonable opportunity to make the delinquent payments.' *Sullivan v. Burcaw*, 35 Idaho 755, 763, 208 P. 841, 842 (1922)."

*Fajen*, 98 Idaho at 248, 561 P.2d at 390. The Court's opinion gives proper recognition to *Fajen*, but then inexplicably denies its application because the counterclaim did not seek to forfeit or rescind the contract. The Court relies on a general quote taken from Corpus Juris Secundum.[5] The facts, however, clearly indicate that the principles set forth in *Fajen* should be applied in this case. At the time Cox brought suit, he had earlier declared the contract at an end; he did not sue on the contract, but to recover monies paid on it. Crandlemire, on the other hand, maintained he still had a contract with Cox, and such being so, it behooved him to comply with its terms requiring notice. By giving notice, and only by giving notice, would Cox have been placed in default. Otherwise, as *Fajen* teaches, Cox was led to believe that Crandlemire was waiving strict compliance of the payment schedule, perhaps until the lawsuit was over, or at least until Crandlemire gave

notice. Properly notified, and still claiming the contract to have been rescinded, Cox could have complied and abandoned his suit, or could have maintained his suit and paid the money into Court. He also might have decided to sell his equity rather than litigate. But, in either or any event, he was entitled to the notice which Crandlemire was required to give.

I cannot agree with the Court's statement that *Fajen* is not applicable because Crandlemire did not opt to sue for forfeiture. It is true that he did not, and that he did not is much to his credit. Nevertheless, Crandlemire indulged in Cox's default for five years, and therefore, to my mind, the principles of *Fajen* are applicable. Crandlemire was required to give notice of default as a condition precedent to bringing suit—whether for the balance of the contract, or for a forfeiture. As the Court concedes, Crandlemire did not give any notice of default, or notice of which option he would pursue, and at the time he filed suit, he couldn't sue for the entire balance because of the lack of an acceleration clause.[6]

---

**5.** The Court's quotation from Corpus Juris Secundum, 92 C.J.S. Vendor & Purchaser, § 481 at 461, is not appropriate. The author of the Corpus Juris Secundum section in question relies upon but one (1) case for the statement that a demand is unnecessary where the action is not to forfeit, but to recover the purchase price. That case is *First National Bank of Seattle v. Mapson*, 181 Wash. 196, 42 P.2d 782 (Wash.1935). The facts of that case are extremely convoluted, but it does appear that there was, as here, no acceleration clause in the contract of sale and purchase. A holding of the case, as pertinent here, is that the vendor "was not required to sue for each payment as it became due, but could wait, as it did, until the whole amount matured." *Id.* at 785. That court indicated, as picked up by Corpus Juris Secundum, that the entire balance fell due "just about the time that this action was commenced." *Id.* at 785. Another holding of that court was that "[t]he action itself constituted sufficient demand." *Id.* at 785. The contract there called for small monthly installments of $45.00 each, and the opinion is unclear as to whether the final maturity date of the contract was weeks or days short of having arrived when suit was commenced.

The *Mapson* case, however, does not appear to have ever again been relied upon for the proposition for which it is cited in Corpus Juris

Secundum, and other holdings of the case were specifically overruled in *First Nat. Bank of Everett v. Tiffany*, 242 P.2d 169 (Wash.1952). *Mapson* for certain has never before been relied upon by this Court. More in keeping with this Court's case law is the opening bold type statement which opens § 481: "A vendor is not entitled to sue for the purchase price until he has performed the acts and obligations imposed on him by the contract." 92 Corpus Juris Secundum, Vendor & Purchaser § 481 at 455 (1955).

**6.** The contracts provided that payment of the $7,500 on each lot was to be made in six yearly installments of $1,250, beginning on December 10, 1973. The first installment was paid in 1973, but thereafter no payments have been made by Cox. Crandlemire's counterclaim, filed on August 17, 1978, sought the entire unpaid balance of $6,250 per lot, a total of $12,500. However, at the time his counterclaim was filed, and also at the time of trial on October 24, 1978, the final installment payment on each contract would not have yet been due. Those payments were not due until December 10, 1978. Therefore, in the absence of an acceleration clause, at the time Crandlemire filed his counterclaim and putting aside the notice requirement Crandlemire was not entitled to claim a judgment for the entire unpaid balance.

I can understand the trial court, faced on short notice with the last minute filing of a counterclaim, and perhaps acting in the interests of judicial economy, allowing the counterclaim to be filed for a principal balance due some four or five years down the road, but I am unable to comprehend how this Court, given considerable time to reflect upon the proposition, can so casually ignore the notice of default requirements which a long line of case law teaches must be given where the contract vendor has indulged in the default over an extended period of time—in this case five years. The

trial bench and bar may find it difficult to understand the basis upon which the Court does this. Certainly the general quotations which the Court excerpts from Corpus Juris Secundum does not sustain the abrupt break from Idaho precedent which the Court makes today.

The entire balance was due, however, on March 13, 1979, when the trial court entered judgment in this case.