In re Thomas Mecham RICKS, Debtor.

Jeremy J. Gugino, Chapter 7 Trustee, Plaintiff/Counterdefendant,

v.

Kastera, LLC, an Idaho Limited Liability Company, Defendant/Counterclaimant.

Bankruptcy No. 09–00215–JDP.
Adversary No. 09–6067.

United States Bankruptcy Court,
D. Idaho.

July 27, 2010.

Jeremy J. Gugino, Chapter 7 Trustee, Plaintiff, appearing Pro Se.

Thomas G. Walker, Cosho Humphrey, Boise, ID, for Chapter 7 Debtor Thomas Mecham Ricks.[1]

Jed W. Manwaring, Evans Keane, and Thomas C. Morris, Belnap Law, Boise, ID, for Defendant Kastera.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

### I.

### Introduction

In this contest, two would-be real estate developers disagree concerning the terms and enforceability of their unsuccessful business agreements, and about the consequences that should flow from their alleged respective failures to perform their contractual obligations.

On January 29, 2009, Thomas Mecham Ricks ("Ricks") filed a chapter 11 petition to reorganize his real estate and agricultural businesses.[2] Kastera LLC ("Kastera") filed a creditor's proof of claim in that bankruptcy case on May 27, 2009, contending in it that, as of the petition date, Ricks owed Kastera $3,036,066[3] in damages for his breach of their contracts.

On August 26, 2009, Ricks initiated this adversary proceeding against Kastera. In his complaint, Ricks alleged, among other things, that it was Kastera that had breached the contracts with Ricks, and that Kastera had defrauded him in their dealings. *See* Docket No. 1. For relief, Ricks objected to Kastera's proof of claim,

---

1. As discussed below, this adversary proceeding was initiated by Mr. Ricks in his capacity as a chapter 11 debtor-in-possession. Mr. Gugino, the chapter 7 trustee, was substituted as the proper party-plaintiff following the conversion of the bankruptcy case to a case under chapter 7.

2. Unless otherwise indicated, all chapter and section references are to the Bankruptcy

Code, 11 U.S.C. § 101 –1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

3. This amount consists of $2,231,250 in principal, $699,816 in interest, and $105,000 in base draws, for a total of $3,036,066. *See* Claim Register 18–1, Bankruptcy Case No. 09–00215–JDP.

contending that no debt to Kastera was owed. *Id.* Moreover, Ricks sought an award of money damages against Kastera. *Id.*

Kastera filed an answer to the complaint, along with a counterclaim against Ricks. In its counterclaim, Kastera alleged that the parties' agreements were invalid and unenforceable, and that they should be deemed to have been rescinded. *See* Docket No. 6. Alternatively, Kastera alleged that it was actually Ricks who breached the agreements and defrauded Kastera. *Id.* Kastera sought a return of the monies paid to Ricks via validation of its proof of claim in the bankruptcy case.

While each party sought a summary judgment, on March 4, 2010, the Court denied those motions, concluding that there were a variety of disputed material fact issues that needed to be decided after trial. *See* Docket No. 41. On April 8 and 9, 2010, the Court conducted the trial.[4] The parties thereafter submitted their closing arguments via written briefs, and the issues were taken under advisement by the Court. *See* Docket Nos. 58–61.

Then, on June 18, 2010, on motion of Kastera, the Court entered an order converting Ricks' chapter 11 case to a case under chapter 7. Because Ricks' claims against Kastera asserted in the adversary proceeding are property of the bankruptcy estate, and because a chapter 7 trustee, Jeremy Gugino, had been appointed to administer that estate, the Court convened a status conference on July 8, 2010 to discuss how this matter should proceed. Gugino, and the attorneys for Ricks and Kastera participated in that conference. *See* Minutes of Status Conference, Docket No. 64. At that conference, all parties agreed that Gugino should be immediately substituted as the party-plaintiff in this action, something the Court accomplished via entry of an order that same day. Docket No. 65. In addition, Gugino asked that the Court proceed to decide the issues under advisement and issue a decision without further hearing or argument, a course of action also endorsed by Ricks and Kastera.

Having now carefully considered the evidence and testimony, the parties' submissions, and the applicable law, the Court issues this Memorandum of Decision which constitutes the Court's findings of fact and conclusions of law. Rule 7052.

## II.

### Findings of Fact[5]

#### A. The Spur Ranch Agreement.

---

4. While the parties called several witnesses at trial to testify, just prior to trial, on April 1, 2010, the parties stipulated to the admissibility of one another's documentary trial exhibits, subject to any objections based on relevancy or materiality. Docket No. 46. Then, only a few days later, Kastera filed a motion to exclude any expert testimony to be offered by Ricks' witness Gale Pooley regarding his alleged damages, as described in Ricks' proposed exhibits 146 and 147. *See* Docket No. 50. At the beginning of the trial the Court denied Kastera's motion, but indicated that it would take under advisement Kastera's objections to exhibits 146 and 147, and to any testimony by Mr. Pooley concerning damages, with those matters to be addressed in this decision on the merits. *See* Trial Transcript, Day 1, 12:11–20. Docket No. 54. The Court admitted into evidence all of the parties' other exhibits per their stipulation, and deals with Kastera's objections to the Pooley testimony and exhibits below.

5. The findings of the Court set forth herein include both disputed and undisputed facts. In resolving disputed issues of fact, the Court has carefully considered the testimony of the various witnesses, and based upon its opportunity to observe them testify, the Court has assessed their credibility. Since the testimony of the witnesses was in some instances inconsistent with other evidence presented, the Court's findings reflect its judgment concerning the relative weight assigned to that testimony. Additional findings of fact are set

It is not hyperbole to say that, in 2005, the residential real estate market in Idaho's Treasure Valley was red hot. In particular, lots suitable for building homes in the area of Eagle, Idaho were in extremely high demand, and in very short supply.

At that time, Kastera was a start-up home builder. It was therefore critical to its business plan that it acquire building lots near Eagle so it could construct and sell its homes. Var Reeve ("Reeve") was the principal of Kastera. While he was enthusiastic and energetic, he was burdened by a lack of prior experience in real estate development or construction.

Ricks was a long-time resident of the area, and had considerable experience in acquiring and developing residential real estate. While he also had other projects underway and in planning, in December 2004, Ricks had undertaken to develop and further subdivide approximately 15.75 acres of residential property in Eagle. He referred to this project as the Bellemeade and Bellewood Village subdivisions, and he intended to market the lots in the subdivisions as the first phase of a larger project he called "Spur Ranch." [6]

In the spring of 2005, Ricks and Reeve were introduced to one another by a mutual acquaintance, and began discussing potential joint development projects, including the Spur Ranch development. Ricks considered Kastera to be an attractive potential buyer for the development because the company apparently had access to capital to finance the development of, and to then purchase, virtually all of the finished building lots that Ricks could finish within Spur Ranch. According to Ricks, this was

desirable since he needed money for his business ventures, and because it relieved him of the need to deal with multiple buyers and real estate agents in order to market the property. The notion of a deal with Ricks was also attractive to Kastera because it could provide Kastera with a large number of building lots built out to its standards within a relatively short time to meet growing demand for new homes in Eagle. At bottom, both Ricks and Kastera saw a business marriage as potentially profitable.

By June 2005, Ricks and Reeve had reached an informal, oral understanding regarding the terms of Ricks' development, and Kastera's purchase, of the building lots in Spur Ranch. The parties agreed that Kastera would fund Ricks' development of the lots to Kastera standards, and then buy the lots in Spur Ranch for a per lot price. To accomplish this plan, Reeve, on behalf of Kastera, agreed to advance a portion of the final purchase price for the lots to Ricks when Ricks obtained preliminary plat approval for the subdivision from the City of Eagle. The balance of the purchase price would be payable by Kastera to Ricks when the development was complete, the final plat had been approved, and Ricks could convey lots to Kastera so it could begin constructing houses on them. While this was to be a multi-million dollar venture, incredibly, no written agreement was prepared to evidence the parties' deal at that time.

On June 3, 2005, Ricks filed a Preliminary Plat Application with the City of Eagle.[7] Ex. 239. In the application Ricks proposed to subdivide the three parcels

---

forth later in this Memorandum in connection with the Court's discussion and dispositions of the issues in this action.

**6.** Phase I of Spur Ranch is legally described as Lots 1 and 2 in Block 1, and Lot 2 in Block 2 of Flint Estates Amended Plat, Book 45 of

plats at pages 3713 and 3714. These three parcels are located at 312 North Park Lane, 3850 West Flint Drive, and 3855 West Flint Drive, Eagle, Idaho.

**7.** The application actually listed Ricks and John Wood as the applicants.

comprising Bellemeade/Bellewood Village into forty-eight (48) residential lots and fourteen (14) common area lots, for a total of sixty-two (62) lots, in what would be known as "Phase I" of Spur Ranch. *Id.* The project narrative, attached to the application, indicated that the land was owned[8] by Ricks, and that he was the developer.

Ricks and Reeve were both present at a public meeting of the Eagle City Council in September 2005 when the application was reviewed by the council, and conditionally approved. After the hearing, formal findings of fact and conclusions of law were issued by the city to evidence its decision to approve the preliminary plat on October 11, 2005. They stated, in part, that Ricks had been approved to develop forty-seven (47) residential lots and sixteen (16) common lots,[9] and that the size of common area would be 3.00 acres, or 19.05% of the total project. Exhibit 103. As is frequently the case, the City's approval of the plat was subject to a number of standard and other "site-specific" conditions. One condition required Ricks to comply with the requirements of Drainage District # 2 concerning the property. *Id.* The findings and conclusions also required Ricks to provide documentation from the Army Corp of Engineers ("Army Corp") to the city engineer regarding whether the

development would need a so-called "404–permit"[10] in dealing with a drainage ditch on the property. *Id.* Kastera received a copy of the city's approval of Ricks' preliminary proposal, its findings and conclusions, and Reeve and other Kastera agents were aware of the limiting conditions for approval of the preliminary plat.

Although the City had approved the preliminary plat, Kastera did not immediately advance any funds to Ricks as contemplated by the parties' oral understanding. Anxious to move forward with their deal and project, Ricks prepared a short, six-paragraph, handwritten memorandum which purported to memorialize the terms of the parties oral deal, or at least his understanding of its terms. Ex. 135. Ricks' son, Thomas Aaron Ricks ("Aaron")[11], typed the memorandum[12] and forwarded it to Thomas Morris ("Morris"), Kastera's newly hired in-house general counsel. *See* Ex. 136. As might be expected, since the contract contemplated a deal requiring Kastera to pay Ricks over $5 million, lawyer-Morris had several concerns with Ricks' bare-bones draft of the agreement.

On November 30, 2005, Ricks, Aaron, Reeve, and Morris met at Kastera's offices to discuss whether the parties intended to go forward with the deal and the draft

8. Although the preliminary plat application only listed Ricks as the owner of the property, at that time, two other individuals held an interest in portions of the land. The land ownership is discussed in more detail below.

9. The Court appreciates that the number of house lots approved by the Eagle City Council varies slightly from the number contemplated in Ricks' original application.

10. This apparently was a reference to section 404 of the Clean Water Act, 33 U.S.C. § 1251, *et seq.* That statute regulates the placement of dredged or fill materials into waters of the United States, including areas deemed to be wetlands.

11. No disrespect is intended by the Court's references to Ricks' son by his middle name. The parties have done so in this litigation, and the Court deems it helpful to promote clarity in this decision.

12. In his deposition, a transcript of which was admitted in evidence as Ex. 141, Aaron explained that he typed the agreement exactly as his father had written it in longhand. *Id.* at 41:7. However, in comparing these exhibits, the Court noticed slight variations between the two documents. Despite these minor inconsistencies, the fundamental terms of the agreement remained the same.

contract terms. At that meeting, among other topics, the parties briefly discussed the estimated date that the completed lots would be available to Kastera, the precise purchase price for the lots and the amount Kastera would advance as an initial payment to Ricks, the quality and extent of landscaping and other amenities to be included by Ricks in the development, and the status of the title to the real property.[13] To alleviate Morris' concerns, and as a result of these discussions, Morris drafted a modified version of Ricks' original version of the agreement; even that draft was remarkably concise in its terms.

One of Morris' modifications to the contract draft involved insertion of a specific date by which Ricks would convey the finished, platted lots to Kastera, which was also the date on which Kastera was obligated to pay the balance of the contract price to Ricks. Ricks' original draft merely indicated that the balance was due when Ricks provided Kastera with lots and Kastera could obtain building permits for those lots; it did not include a date certain.

Ricks understood that Kastera wanted the lots as soon as possible, but he was hesitant to commit to a specific deadline to deliver "saleable lots." However, as a result of Morris' insistence that some sort of date was needed in the agreement, Ricks agreed to include the following language in the agreement: "Kastera agrees to pay Ricks the remaining 62.5% of the gross sales price at the time Kastera can receive building permits for the lots in phase one, *which Ricks estimates will be sometime in the spring of 2006.*" Ex. 100 at ¶ 2 (emphasis added).

An additional paragraph relating to Ricks' ownership of the land comprising the development was also added to the modified draft. This paragraph provided:

Ricks represents and warrants to Kastera that he owns and possesses all right, title, and interest in and to the Spur Ranch property free and clear of all liens, claims, encumbrances, covenants, conditions, and restrictions that would prevent Ricks from developing the lots as contemplated hereunder and conveying them to Kastera in good and marketable condition. At the time of closing, Ricks will convey to Kastera good and marketable title to the lots free of all liens, claims and encumbrances. Ricks further represents that to the best of his knowledge, no hazardous materials have been transported to or from, or generated, placed, held, released, located, stored, or disposed of on, under, or at the Spur Ranch property.

Ex. 100, at ¶ 6. Of course, as a matter of fact and public record, and notwithstanding this provision, at that time, Ricks did not own all of the property that comprised Phase I of Spur Ranch on November 30, 2005. Ricks owned only the western four acres of the five-acre parcel located south of Flint Drive; Sylvia Jones owned the other one-acre portion on the east side of that parcel. In addition, Ricks held only an unexecuted option, not fee title, as to one of the five-acre parcels on the north side of Flint Drive; that property was owned by the Woods.[14] And, as noted

13. The parties disagree about whether Ricks disclosed at this meeting that he did not have clear title to the entire 15.75 acres, the rights of any third parties, or the existence of certain encumbrances on the land in the form of deeds of trust Ricks had granted to lenders as to some portions of the property. Ricks and Aaron emphatically insist that the encumbrances were disclosed; Reeve and Morris deny that the encumbrances were mentioned.

At any rate, the deeds of trust encumbering one of the five-acre parcels in Spur Ranch were, at that time, a matter of public record, having been recorded on May 11, 2005. *See* Exs. 101, 102.

14. On December 3, 2005, shortly after the Kastera agreement was signed, Ricks met with Robert and Jason Wood and negotiated the closing on this preexisting option. As

above, the other five-acre parcel was, at that time, subject to a lender's deed of trust to secure the unpaid balance on a loan made by the lender to Ricks. On the other hand, Ricks was confident that, by the time he was required to hand over the finished lots to Kastera, he would have acquired and held clear title to the property.

With these changes, the revised version of the memorandum of their agreement (the "Spur Ranch Agreement") was signed on November 30, 2005 by Ricks and Reeve.[15] It provided its terms were retroactively effective on June 1, 2005. Ex. 100.

The Spur Ranch Agreement described the property subject to the contract as "all the lots in the first phase of Spur Ranch (recorded name of Bellemeade Subdivision in Eagle, Idaho, legal description attached hereto as Exhibit A)" consisting of "14 lots south of Flint Drive and 30 lots north of Flint Drive." *Id.* At the time the contract was signed by the parties, there was no legal description attached to the document. Morris testified that he later attached a legal description,[16] but that he could not recall its source. However, the most likely source for this description was a title report that Kastera obtained for the property shortly after the Spur Ranch Agreement was signed. Ricks testified that the legal description that was ultimately attached to the Spur Ranch Agreement was indeed the correct legal description for the project.

The day after the Spur Ranch Agreement was signed, Kastera wire-transferred $2,231,250 to Ricks' bank account. According to the contract, this amount represented 37.5% of the total amount Kastera had agreed to pay to Ricks to develop and convey to Kastera 44 lots in Phase I of the Spur Ranch development. The amount payable from Kastera to Ricks was calculated as follows: for the fourteen (14) lots on the south side of Flint Drive, Kastera would pay Ricks $125,000 per lot; and for the thirty (30) lots on the north side of Flint Drive, Kastera would pay Ricks $140,000 per lot (*i.e.*, $125,000 × 14 = $1,750,000 and $140,000 × 30 = $4,200,000).

After the Spur Ranch Agreement was signed, Ricks continued his efforts to satisfy the conditions in the preliminary plat, so that he could obtain approval of a final plat from the City of Eagle, and begin construction of the extensive development improvements. In particular, the preliminary plat called for a drainage ditch which was located on the property to be filled. However, at that time, the Army Corp had not yet determined whether it would assert jurisdiction over the drainage ditch, thereby requiring Ricks to obtain a 404-permit for the work. Over the next several months, Ricks, along with the engineering firms he employed, worked with the Army Corp to resolve the issues surrounding the drainage ditch and to obtain the necessary permits and licenses. During this time Ricks and Aaron met with Reeve and other Kastera representatives on a periodic basis to report their progress. It was not until January 30, 2007, that Ricks finally learned that the Army Corp would indeed assert jurisdiction over the drainage ditch. *See* Ex. 110. However, on

---

part of that deal, Ricks agreed to reserve two undefined building lots in Spur Ranch within that five-acre parcel for Robert Wood as a partial payment for transfer of title to the acreage.

15. Reeve signed in his capacity as President of Kastera.

16. The attached legal description referred to the property as: "Lots 1 and 2, Block 1, and Lot 2, Block 2, of Flint Estates Amended Plat, Book 45 of plats at pages 3713 and 3714." Ex. 100.

March 23, 2007, he was informed that, in the opinion of the Army Corp, the development project fell under a particular irrigation exemption, and that a 404–permit would not be required to complete his work on the drainage ditch. *See* Ex. 113. Shortly thereafter Ricks was also able to secure the approval and appropriate licenses from Drainage District # 2 to pipe the drainage ditch, and move forward with the development.

During the spring and summer of 2007, communication between Ricks and Reeve became strained and sporadic. Reeve and Kastera had become frustrated with Ricks' lack of progress on Spur Ranch. Moreover, the residential real estate market was beginning to soften significantly. Reeve was worried about the level of Ricks' commitment and effort to complete Spur Ranch. In addition, at that time, Kastera was involved in restructuring into two entities, with one involved in home construction, and a new entity handling real estate development. Although Ricks and Reeve regularly encountered one another at church, Ricks testified that it was his practice not to discuss business there. Instead, during this time, Ricks sent several letters to Reeve requesting information that he needed to satisfy various conditions for final plat approval, and seeking guidance on which Kastera entity or personnel he needed to be dealing with concerning Spur Ranch. *See* Ex. 115, 116.

Also during this time, Ricks was endeavoring to secure financing in order to complete the actual construction of the improvements in Phase I of Spur Ranch. In May of 2007, Ricks received tentative approval for a construction loan from Washington Trust Bank. However, shortly thereafter, the bank's proposal was withdrawn. Ricks testified that he understood that the reason for the withdrawal was

that Dean Oberst, one of the bank's managers, had learned that Kastera did not intend to complete the contract to acquire the lots in Phase I of Spur Ranch.

Later, Ricks was able to obtain a conditional construction loan commitment from D.L. Evans Bank. However, for final approval, Ricks testified that the bank required him to obtain some evidence from Kastera to assure the bank that Kastera would indeed close the Spur Ranch Agreement upon completion of the development. In a letter dated March 28, 2008, the bank summarized its position:

> We advised you that in order for D.L. Evans Bank to consider a development loan we would need a guarantee that the subdivisions sales agreement [the Spur Ranch Agreement] would close upon completion.
>
> We were and remain unable to offer an approval for development financing without a guarantee in the form of a Letter of Credit. If Kastera were able to produce a Letter of Credit from an acceptable Bank, insuring their performance to pay off the development loan, we would reconsider your request.

Ex. 119.

Kastera balked at the idea of obtaining a letter of credit to secure its obligation under the Spur Ranch Agreement. This proposal also bothered greatly both Reeve and Morris, since it was their impression that Ricks had committed to use the money advanced by Kastera for construction on Spur Ranch, and now, Ricks was indicating those funds had been spent, and a large bank loan was needed to complete the work. In the end, without Kastera's cooperation, Ricks was unable to obtain the financing he needed to complete construction of the lots in the Spur Ranch development.[17]

---

**17.** Ricks also explored the possibility of obtaining a construction loan from Idaho Banking Company, though it appears his proposal was denied.

Things between the parties came to a head in the fall of 2007. At that time, Kastera hired legal counsel, who sent a letter to Ricks dated October 12, 2007, accusing him of failing to perform the parties' agreement, and demanding "a full and complete rescission of [Kastera's] agreement with Tom Ricks and a complete return of the $2,231,250 paid to him." Ex. 120. Ricks refused this demand. He felt he had done nothing wrong, and he expected Kastera to honor its commitment to pay him to acquire the Spur Ranch lots. A stalemate ensued.

Thereafter, the Eagle City Council completed its review of Phase I of the Spur Ranch project and approved a final plat; its findings of fact and conclusions of law confirming this were issued on December 5, 2007. Ex. 117. However, owing to his lack of financing, Ricks was, and still remains, unable to complete the improvements for the development, so the final plat has never been recorded. On December 16, 2009, the Eagle City Council approved an extension for the final plat until November 20, 2010. Ex. 124.

## B. The Other Properties Agreement.

In addition to their deal involving Spur Ranch, Ricks and Reeve/Kastera contemplated additional business relationships and transactions in 2005. As noted previously, at that time Kastera was seeking to acquire as much property as possible in the Eagle area upon which it could build houses. Ricks, as a long-time resident of Eagle, had developed personal relationships with several landowners in the area. As a product of Kastera's need for property, and Ricks' potential access to sellers, the parties reached another oral understanding.

According to this deal, Ricks agreed to work to persuade land owners to sell their undeveloped property to Kastera. When Kastera acquired the properties under deals brokered by Ricks, Kastera agreed Ricks would then develop the property for Kastera, with Kastera fronting the development costs. As consideration for these services, Kastera agreed to pay Ricks a percentage of the net profit for each finished lot sale.[18]

Like the Spur Ranch Agreement, this oral understanding was later reduced to writing in a series of written contracts,[19] each signed by Ricks and Reeve.[20] These documents evidence what was collectively referred to by the parties as the "Other Properties Agreement." Though dated otherwise, the Other Properties Agreement and the addenda, were all prepared and signed by the parties at about the same time the Spur Ranch Agreement was signed, on November 30, 2005.

One of the writings in the Other Properties Agreement consisted of a single paragraph in which the parties identified three separate properties which were subject to the agreement. Those were: "The Thornton Property located at the Southeast corner of Floating Feather and Highway 16,

---

**18.** In addition, Kastera agreed to pay both Ricks and Aaron monthly draws and provide them with other benefits, with the amount of such draws to be credited against any final payment under the agreement.

**19.** Three separate writings together memorialized the parties' "Other Properties Agreement": the "Agreement, dated June 15, 2005"; the "Addendum to Agreement dated June 15, 2005"; and the "2nd Addendum to

Agreement dated June 15, 2005." Exs. 129, 130, 131.

**20.** In contrast to the Spur Ranch Agreement, where Reeve signed the agreement in his capacity as President of Kastera, it appears that these documents were signed by Reeve in an individual capacity; there are no notations on the signature lines of these documents indicating that Reeve was signing on behalf of Kastera. *See* Exs. 129–131.

Eagle, Idaho. The Purdy Property at the Northwest corner of Floating Feather and Lanewood, Eagle, Idaho. The Gabica Property North of the Purdy Property on Beacon Light Road, Eagle, Idaho." Ex. 130. Another writing identified an additional property known as the Cleaver Property or Pristine Meadows on North Star Road in Star, Idaho. Ex. 131. In addition, this document adjusted downward the percentages of profit distributable to Ricks for some of the properties subject to the agreement. *Id.*

As contemplated by the Other Properties Agreement, Ricks began connecting Kastera with potential sellers, and Kastera began making deals to acquire their various properties. However, in contrast to the parties' agreement regarding development, Kastera denied Ricks' the right to plan and develop these properties. Instead, under the supervision of Wayne Forrey, an in-house member of Kastera's staff, Kastera took over the development of the properties.

## C. The Breakup.

In 2005, in the midst of a booming Treasure Valley home sales market, the Ricks/Kastera ventures surely must have seemed to be good business for all concerned. Communities were eager to see new subdivisions built. Ricks was an experienced developer, already in the process of completing Spur Ranch, a topnotch new neighborhood, and he knew other landowners who may have been willing to cash in on the rising market. And Kastera, which at the time had access to capital, needed lots on which to build, and then sell, houses. The constant appreciation in house sale prices was such that, under the circumstances, time was of the essence, and to the parties, a handshake and verbal understanding certainly seemed adequate at the time to accommodate any risk, even though a multi-million dollar venture was contemplated. What was most important

to the parties was not detailed, written contracts, but instead, "getting the deal done."

Then came 2007, and the real estate market began to sour. After two years of delay and frustrating work to get necessary approvals for a final plat of the Spur Ranch development, the Ricks/Kastera undertaking no longer seemed very attractive to Kastera. Frustrated, and undergoing its own painful restructuring, Reeve and Kastera decided to terminate the parties' contract. Kastera's motivation was understandable enough. Having expended over $2.23 million, and with virtually nothing but Ricks' promise to show for it, it wanted to put an end to the parties' relationship and salvage what value it could.

This bankruptcy case, and in particular, this adversary proceeding, addresses the legal and financial consequences of Kastera's decision. Kastera wants its money returned by Ricks. Ricks, on the other had, was likely bankrupted by the unsuccessful venture and wants Kastera to pay him damages for its breach of the parties' agreements.

## III.

## Conclusions of Law, Discussion, and Disposition of the Issues

### A. Validity of the Spur Ranch Agreement.

Kastera's defense to Ricks' damage claim, and its own claim against Ricks for a refund of the monies it paid him, are based upon its contention that the underlying Spur Ranch Agreement was invalid and legally unenforceable for a variety of reasons.

First, Kastera argues that the parties' verbal agreement, which was later reduced to writing and signed by both parties, contains an inadequate description of the real property to which it relates, and thereby

fails to satisfy Idaho's statute of frauds. Next, Kastera asserts that the agreement is void because it violates both an Idaho statute and the City of Eagle's plat approval ordinance.

Ricks, on the other hand, argues that the description of the property is adequate and that the Spur Ranch Agreement satisfies the statute of frauds and is therefore valid and enforceable. In addition, Ricks contends that any apparent failure to comply with the Eagle City ordinance or the Idaho Code does not necessarily invalidate the agreement. The Court will address each argument in turn.

### 1. The statute of frauds.

The Idaho statute of frauds provides that agreements for the sale of real property are invalid unless the agreement, or some note or memorandum thereof, is in writing and signed by the party to be charged or his agent. Idaho Code § 9–505(4); *Ray v. Frasure*, 146 Idaho 625, 200 P.3d 1174,1177 (2009). The Idaho Supreme Court has consistently held that contracts for the sale of real property that fail to comply with the statute of frauds are unenforceable, and cannot be remedied by specific performance nor serve as the basis for an award of damages. *Frasure*, 200 P.3d at 1177; *Hoffman v. S V Co.*, 102 Idaho 187, 628 P.2d 218, 221 (1981). For such contracts to satisfy the statute of frauds, not only must an agreement for the sale of real property be in writing and subscribed by the party to be charged, but the writing must also contain an adequate description of the property, either in terms or by reference, so that the property can be identified without resort to parol evidence. *Garner v. Bartschi*, 139 Idaho 430, 80 P.3d 1031, 1036 (2003).

Kastera notes that, in recent years, the Idaho Supreme Court has clarified the standard against which the legal adequacy of property descriptions in real estate contracts are measured. Kastera points first to *Lexington Heights Dev., LLC v. Crandlemire*, 140 Idaho 276, 92 P.3d 526 (2004), in which the Idaho Supreme Court invalidated a contract for the sale of land which failed to precisely describe the boundaries of a five-acre parcel which the parties intended to reserve from the sale of a larger 95–acre parcel. No doubt, the Court should consider this decision in resolving the issues presented here.

In *Lexington Heights*, the Crandlemires contracted to sell approximately 90 acres out of a 95–acre parcel of real property they owned to Lexington Heights Development, LLC. The contract described the property being sold as "the real property situated in Ada County, Idaho located at 1400 West Floating Feather Road, consisting of approximately ninety (90) acres ..., however excluding the residential dwelling (which will include no more than five acres) and improvements identified below (herein called 'Premises')." *Lexington Heights*, 92 P.3d at 528. In addition to the house and the improvements, the Crandlemires also intended to reserve an additional small tract of land which they could then convey to United Water Corporation, which planned to construct a water tower on the site. The contract further provided that the precise size, location, dimensions, and configuration of the excluded five-acre parcel would be "mutually determined by Seller and Buyer" through a future survey of the property. *Id.*

After this contract was executed, the property was indeed surveyed and three legal descriptions were prepared: one for the entire property, one for the 4.54 acres which was to be retained by the Crandlemires, and one for the 0.46 acres which the Crandlemires intended to convey to United Water Corporation. After the survey was completed, the parties executed a second real estate contract, which expressly provided that it superseded all prior agree-

ments between the parties. Even though precise legal descriptions had been prepared for the entire property and the parcels to be excluded from the sale, this new agreement did not include nor even refer to those legal descriptions to describe the property to be sold. Rather, the new agreement incorporated the imprecise property description from the first contract.

Eventually, the Crandlemires refused to close the sale to Lexington Heights and ultimately sold forty acres of the property to a third party. Lexington Heights sued the Crandlemires, seeking damages for breach of their agreement and specific performance as a remedy. The district court determined that the agreement was unenforceable because it did not contain a sufficient legal description of the property being sold, and Lexington Heights appealed. The Idaho Supreme Court agreed with the district court, noting that "[t]he legal description in the Agreement does not contain a sufficient description of the property to be sold because it does not contain any description sufficient to identify the approximate five-acre parcel that is to be excluded from the sale." *Id.* at 532. The Supreme Court further explained that "the issue with respect to the statute of frauds is not whether the parties had agreed upon the precise dimensions of the property to be sold. It is whether the written memorandum contains an adequate description of the property to be sold." *Id.* at 533.

Kastera also relies on *Frasure, supra,* where the Idaho Supreme Court held that a property description in a real estate contract that consisted solely of a physical address did not satisfy the statute of frauds. 200 P.3d at 1177. In *Frasure,* the parties contracted for the sale of real property owned by Don Frasure which they described in their written contract as "2275 W. Hubbard Rd., City of Kuna, County of Ada, Idaho 83634." *Id.* at 1175.

Although the contract included a space for a legal description of the property, it was left blank. A box which the parties could have used to indicate that a legal description was attached as an addendum was also left unchecked, and no legal description was attached to the contract. The buyer was not able to close on the contract, and requested a few extra days to perform. Shortly thereafter, the buyer deposited all funds due under the contract with the escrow company. However, the real estate agent representing Frasure informed the buyer that he did not intend to perform under the contract and had relisted the property for sale. Frasure eventually accepted an offer to sell the property to a different party for a significantly higher price. The original buyer sued to have its contract specifically performed. The district court found that Frasure had breached his contractual duties to the original buyer and ordered specific performance of the contract.

On Frasure's appeal, the Idaho Supreme Court explained that a "description of real property must adequately describe the property so that it is possible for someone to identify 'exactly' what property the seller is conveying to the buyer." *Frasure,* 200 P.3d at 1178, (citing *Garner,* 80 P.3d at 1036). Quoting from an earlier decision, the court also noted that "[a] description contained in a deed will be sufficient so long as quantity, identity or boundaries of property can be determined from the face of the instrument, or by reference to extrinsic evidence to which it refers." *Id.* (quoting *City of Kellogg v. Mission Mountain Interests Ltd., Co.,* 135 Idaho 239, 16 P.3d 915, 920 (2000)). The court then held that, standing alone, a physical address is not a sufficient description of property for purposes of the statute of frauds, as it gives no indication of the quantity, identity, or boundaries of the real property to be sold. *Id.* at 1179.

Although *Lexington Heights* and *Frasure* inform the Court's analysis in this action, neither case is precisely on point and both can be distinguished. One significant distinction between those two cases and this one is the fact that both of the Idaho cases dealt solely with a contract for the sale of real property. However, under the Spur Ranch Agreement, the purchase and sale of building lots from Ricks to Kastera is but one component of a larger real estate development venture contemplated by the parties.

At the time the Spur Ranch Agreement was orally made, and then executed in writing, Kastera was a relatively new business, and not heavily engaged in developing real property; its primary business was *constructing* and selling houses. In other words, at that time, raw land that had not been platted and developed into buildings sites would have been of little use to Kastera. Had it acquired the unplatted Spur Ranch property, it would have had to either hire someone to develop it into buildable lots, or have attempted to undertake that complex task on its own. Based upon the evidence, neither prospect seemed very realistic at the time.

Without doubt, Kastera needed not only the land, but also Ricks' development skills and experience to transform the bare ground into completed lots so that Kastera could do what it did best—build and sell houses. Put another way, while the Spur Ranch Agreement obviously provided for the purchase and sale of real estate, it also contained the parties' agreement that Ricks would employ his considerable skills to develop the property into buildable lots, ready for Kastera's use. In this sense, the Spur Ranch Agreement is a sort of hybrid—a combination of both the purchase/sale of land, and a personal services contract requiring Ricks to complete the development, in many respects, to Kastera's standards. Because only one aspect of the contract deals with the sale of real estate, the Court is confident that, under these facts, the Idaho Supreme Court would not hold the Spur Ranch Agreement completely unenforceable, and thereby deprive Ricks of the value of the services he was to provide in developing the subdivision.

In terms of judging the adequacy of a contract's description of property to be sold, then, it appears clear enough from *Frasure* that a property description consisting solely of a physical address will fail to satisfy the statute of frauds. The reason for the court's holding is apparent: although the general location of the subject property in that contract may be ascertained, the precise quantity of land, and the specific boundaries of the parcel intended for sale, are not readily determinable.

But defects like those in the *Frasure* contract are not present in the Spur Ranch Agreement. Not only can the general location of the subject property be ascertained from the face of the Spur Ranch Agreement, the precise quantity of building lots and the exact outer boundaries of the project are clear from the legal description attached to the contract. Put another way, in their contract, Ricks and Kastera did not stop at inclusion of a physical address for the property, as did the parties in *Frasure*; rather, they provided the existing legal description of the entire property, and identified a specific amount of completed lots that were to be developed and sold by Ricks to Kastera within each portion of that parcel. In this fashion, the Court concludes the parties have described the location, quantity, and boundaries of the property to be sold. *See Frasure*, 200 P.3d at 1178 ("A description contained in a deed will be sufficient so long as quantity, identity or boundaries of property can be determined by the face of the instrument[.]"). Indeed, since the

Spur Ranch property had not yet been finally platted, they had no choice but to rely upon a legal description of the whole property supplemented by other informal identifying information. In the Court's view, under the circumstances, neither Ricks nor Kastera could have been more precise in describing the subject property, given the legal description of the property that was available to them at the time.

The same could not have been said of the parties in *Lexington Heights*. In that case, the buyer and seller contemplated further negotiations over the specific boundaries of the five-acre parcel of land which was to be excluded from the sale—leaving the description of the property that was to be sold somewhat in question. Although that small parcel had been surveyed, and a separate legal description had been prepared, the buyer and seller in *Lexington Heights* chose not to utilize that legal description in describing the property to be sold. By contrast, in this case, at the time Kastera executed the Spur Ranch Agreement, no further negotiations over specific lots nor additional surveys of the property were immediately contemplated. Indeed, based upon the testimony of Reeve regarding Kastera's approach to acquiring land, and the other testimony and evidence, the Court finds that Reeve did not even care which of the 44 lots in the finished subdivision Kastera ultimately received.[21] To Reeve and Kastera, provided they met Kastera's guidelines, lots were lots—a fungible commodity that merely represented an available location upon

which it could build and then sell a house. In short, Kastera merely wanted any 44 of the finished lots in Phase I of Spur Ranch, and it wanted them as soon as possible. Under these circumstances, Ricks and Kastera described the property as accurately as possible, given the information available to them at the time.[22]

The Court concludes, under these facts, that the Spur Ranch Agreement contains a sufficient description of the property to be sold to Kastera to satisfy the Idaho statute of frauds.

## 2. The Idaho Code and the Eagle City ordinance.

Kastera next relies upon Idaho Code § 50–1316 and an Eagle City ordinance to argue that the Spur Ranch Agreement can not be enforced. The city ordinance simply provides that "[n]o lots shall be sold until the plat has been recorded in the office of the county recorder." Eagle City Code § 9–2–7. The City Code also provides that violations of this ordinance constitute misdemeanors, and are punishable by fine or imprisonment, or both. *See* Eagle City Code § 9–6–5, and § 1–4–1. Likewise, the Idaho statute also provides for a fine for selling or offering for sale lots in a subdivision prior to the final plat being recorded. Idaho Code § 50–1316 (providing that "[a]ny person who shall dispose of or offer for sale any lots in any city or county until the plat thereof has been duly acknowledged and recorded ... shall forfeit and pay one hundred dollars ($100) for each lot and

---

**21.** The only condition placed by the parties on which lots Kastera was to receive was specified in their written contract: fourteen of the lots were to be on one side of Flint Drive, and thirty were to be on the other side.

**22.** Of course, at the time the parties signed the Spur Ranch Agreement, the preliminary plat showing the approximate lot locations had been approved by the City of Eagle. It laid out the location of the building lots (47 in

all) and of the commons areas. Having contracted to receive 44 of the lots, 30 and 14 on each side of Flint Drive, Kastera certainly had a reasonably precise understanding of what it was buying. Since the lots could not be described as such until the final plat was approved after the development was complete, Kastera had as much information as it could reasonably expect about the location of the lots covered by the Spur Ranch Agreement.

part of a lot sold or disposed of or offered for sale."). Kastera argues that because Ricks' attempted sale of unplatted lots in the Spur Ranch Agreement is expressly prohibited by statute, the contract is void. The Court respectfully disagrees.

In *Cox v. Mountain Vistas, Inc.*, 102 Idaho 714, 639 P.2d 12 (1981), the Idaho Supreme Court addressed this very issue. In that case, the court noted that "where certain acts or omissions are expressly proscribed by statute, contracts based on such acts or omissions are void." *Id.* at 19 (citing *inter alia, Wheaton v. Ramsey*, 92 Idaho 33, 436 P.2d 248 (1969); *Whitney v. Continental Life & Accident Co.*, 89 Idaho 96, 403 P.2d 573 (1965); *Messerli v. Monarch Memory Gardens, Inc.*, 88 Idaho 88, 397 P.2d 34 (1964)). However, the court also explained that it normally refuses to "extend the terms of a statute to void a contract unless such a result was within the intent of the legislative body." *Id.* (citing *Gallafent v. Tucker*, 48 Idaho 240, 281 P. 375 (1929)). After analyzing several more recent cases in other states, the court explained that "[t]he language of [Idaho Code § 50–1316] does not prohibit the act, i.e., the sale of lots of an unrecorded plat, nor does the provision mandate that the vendor must record the plat prior to contracting for the sale of the realty." *Id.* at 20. Accordingly, the court held that the legislature had dealt with this subject completely and did not intend to invalidate real estate contracts where the seller failed to record the plat prior to offering a lot for sale. *Id.* Based upon this decision, the Court has no doubt that the Idaho courts would also not allow Kastera to rely upon a similar city ordinance to prevent enforcement of its contract with Ricks. Thus, under *Cox*, the Court concludes that the Spur Ranch Agreement is not void merely because the final plat to Spur Ranch was not recorded at the time the Spur Ranch Agreement was executed.

## B. Was the Spur Ranch Agreement Breached?

Having concluded that the Spur Ranch Agreement is not rendered unenforceable under the Idaho statute of frauds, or void for failure to comply with Idaho Code § 50–1316 and Eagle City Code § 9–2–7, the Court must next consider whether the Spur Ranch Agreement was breached, and if so, by which of the parties.

### 1. *Kastera's arguments regarding breach.*

Kastera argues that Ricks breached the Spur Ranch Agreement in at least two ways. First, it contends that Ricks breached the Spur Ranch Agreement by failing to timely deliver the completed lots by June 2006, or within any reasonable time thereafter. Kastera also argues that Ricks breached the warranty to convey the lots to Kastera free of any liens or encumbrances. As explained below, both of these arguments lack merit.

When Ricks and Reeve initiated their arrangement in the spring of 2005, both parties anticipated that Phase I of Spur Ranch could be completed relatively quickly. Ricks certainly understood that Kastera was anxious to obtain lots suitable for construction as soon as possible to take advantage of the then-booming housing market. As an experienced developer familiar with the market, Ricks understood the importance of timing in this context. However, that same experience had taught Ricks that occasionally, if not often, unforeseen circumstances and setbacks can delay development projects. With that in mind, Ricks credibly testified that, as things stood in 2005, he was reluctant to fix a date certain in his arrangement with Kastera by which he would be required to deliver completed lots to Kastera. However, he remained hopeful, indeed optimistic, that he could do so quickly.[23] Reflecting

---

**23.** Indeed, Ricks also had a financial incentive to complete the project timely, as the

this concern, Ricks' original handwritten draft of the parties' agreement made no mention of a specific closing date. *See* Ex. 135.

When the parties met in November of 2005 to finalize the deal, the Eagle City Council had already conditionally approved the Spur Ranch preliminary plat. Given the information included in the City's findings of fact and conclusions of law, both parties were aware that, before the final plat would be approved, issues regarding the drainage ditch needed to be addressed to the potential satisfaction of both the Army Corp and Drainage District # 2. And Reeve and Kastera were aware that Ricks had been working on those issues, but that a final resolution had not been reached. Nonetheless, Kastera, through Morris, insisted that a closing date must be included in the contract. Ultimately, Ricks consented to language which Morris drafted:

> Kastera agrees to pay Ricks the remaining 62.5% of the gross sales price at the time Kastera can receive building permits for the lots in phase one, *which Ricks estimates will be sometime in the spring of 2006.*

Ex. 100 (emphasis added).

If by this language Kastera intended to hold Ricks to a firm closing date, Morris' attempt to do so was ineffective. At the trial, Ricks testified that he did not consider this additional language to represent a binding commitment to deliver lots to Kastera by the following spring. Instead, he viewed this term more as an aspirational goal which he sincerely hoped to achieve. Given the information he had at the time, it is not surprising Ricks believed that he would be able to produce completed lots to Kastera by that time. However, as the circumstances evolved, Ricks could not complete a resolution of the drainage ditch issues by the end of spring 2006, and consequently could not finish the development improvements and deliver completed lots to Kastera at that time.

This delay was surely bad news to Kastera. Even so, over the next several months, Kastera did not declare Ricks in default. Instead, in frequent meetings, Reeve and others at Kastera merely encouraged Ricks to work hard to get the drainage issues promptly resolved, the plat finalized, and the subdivision improvements finished.

From the Court's perspective, the facts show that the parties deliberately employed the rather vague language of the Spur Ranch Agreement regarding a date for delivery of the finished lots to Kastera, and that they intended only that the completion date in the contract serve as a goal, representing their joint hopes that the project would be completed in the near future. Clearly, the contract did not command Ricks to deliver completed lots before the first day of summer in 2006, as Kastera now suggests in its briefs. Kastera, whose legal counsel drafted the revisions to the Spur Ranch Agreement now in play, could have easily spelled out that time was of the essence with respect to finishing this project, and could have included a firm deadline for Ricks to complete performance. The language Morris drafted did no such thing. Moreover, Kastera's actions after June 2006 suggested it did not intend that Ricks' inability to deliver lots as "estimated" in the Spring of 2006 would be a dealbreaker. The uncontroverted testimony at trial was that after this date, Kastera repeatedly encouraged Ricks to continue working with the Army Corp and others to resolve all issues necessary to obtain the

---

$3,718,750 balance due to him under the contract was payable to him only upon delivery

of the finished lots to Kastera.

final plat and finish developing the lots. This encouragement continued throughout the remainder of 2006 and through the summer of 2007. Given these facts, the Court concludes that Ricks did not breach the agreement by failing to deliver completed lots to Kastera by the end of spring 2006.

 The argument that Ricks breached the Spur Ranch Agreement by failing to deliver unencumbered title to the property to Kastera also fails. As previously discussed, another one of the provisions that Kastera's attorney added to the Spur Ranch Agreement prior to its signing pertained to the quality of Ricks' title to the Spur Ranch property. It states:

> Ricks represents and warrants to Kastera that he owns and possesses all right, title, and interest in and to the Spur Ranch property free and clear of all liens, claims, encumbrances, covenants, conditions, and restrictions that would prevent Ricks from developing the lots as contemplated hereunder and conveying them to Kastera in good and marketable condition. At the time of closing, Ricks will convey to Kastera good and marketable title to the lots free of all liens, claims and encumbrances. Ricks further represents that to the best of his knowledge, no hazardous materials have been transported to or from, or generated, placed, held, released located, stored, or disposed of on, under, or at the Spur Ranch property.

Ex. 100, at ¶ 6.

At trial, Morris explained his reasoning as to why this particular paragraph was added to the contract. Although he conceded that the provisions of this paragraph (like others) may have been inartfully drafted, Morris indicated that its purpose was two-fold. First, Morris indicated this provision was intended to require that Ricks warrant that all of the real property in the subdivision covered by the agreement was currently owned by Ricks free and clear of all liens or encumbrances. And secondly, Morris says, this provision was intended as an additional warranty by Ricks that the property would remain unencumbered for the duration of the project.

In his testimony, Ricks firmly denied having represented to Reeve or Morris that the property was free of all encumbrances at the time the Spur Ranch Agreement was signed. Ricks noted that, when read as a whole, the contract provision in question merely represents that the property was free of all covenants and restrictions that would prevent him from developing it as a residential subdivision. Ricks acknowledged that, in November, 2005, at least two deeds of trust encumbered one of the five-acre parcels making up Phase I. However, Ricks contended that those mortgages did not prevent him from moving forward with development of the property as contemplated by the parties' agreement. And while he did not own fee title to some of the subdivision property when the contract was signed, Ricks testified that he understood his obligation was to provide clear title to the lots when he conveyed them to Kastera upon his completion of the subdivision, something he certainly intended to do had Kastera performed.

After considering the testimony and evidence, and mindful that it was Kastera's legal counsel who drafted this provision, the Court is inclined to agree with Ricks that this is the limit of his obligation on this point. *See In re Haskew*, 01.2 I.B.C.R. 62, 64 (Bankr.D.Idaho 2001) (if a contract is ambiguous, the court may construe ambiguities against the drafter).

Kastera, via a title report concerning the property received within a few days after the Spur Ranch Agreement was signed, was aware of the trust deeds encumbering

the land, and that others claimed an ownership interest in portions of the property. While its witnesses profess that this was alarming news, curiously, Kastera did not promptly demand that Ricks remove these title encumbrances, nor even bring this purported concern to his attention until the parties' relationship began to unravel over a year later.

Kastera is, of course, correct in pointing out that Ricks had failed to deliver unencumbered property to Kastera by the time of the trial, and indeed, could not do so because of the on-going liens. However, its argument that Ricks has heavily saddled the property with mortgages in the amount of nearly $1 million with no reasonable plan or explanation as to how he can clear title to the property is of no moment. As the Court reads it, the Spur Ranch Agreement does not require Ricks to convey good and marketable title to the lots to Kastera until the time of delivery of lots. Since Kastera terminated the contract prior to Ricks' completion of the development, that Ricks can not presently convey good title to Kastera does not constitute a breach of the agreement.

The Court's conclusions regarding this provision of the Spur Ranch Agreement are consistent with its understanding of prevailing practices in real estate dealings. As noted in one treatise:

> The general rule is that a title to be furnished by the seller under an executory contract must ordinarily be a good title as of the date when the contract requires it to be furnished. Thus, in the absence of fraud or misrepresentation, a purchaser cannot, prior to the time fixed by the contract for conveyance, complain that the seller's title is defective or encumbered. An encumbrance or other defect that is removable by the time set for conveyance cannot provide a ground for rescission.

57 Am.Jur. Proof of Facts 3d 287 § 8 (2009) (citations omitted).

The Idaho Supreme Court has consistently followed this general rule. In *Sherwood v. Daly*, 58 Idaho 744, 78 P.2d 357, 359 (1938), the court stated: "A vendor under a land contract is only required to have the title contracted for at the time performance is due." Likewise, in *Metzker v. Lowther*, 69 Idaho 155, 204 P.2d 1025, 1032 (1949), the court held that the sellers "were obliged to perform the covenant to have title free from liens, defects and encumbrances only when performance was due." More recently, the court applied this rule, and noted an additional rule which provides that "the existence of an encumbrance which may be removed or discharged by application of the purchase money is not considered such a defect as to render the title unmarketable and excuse the purchaser from the performance of his contract." *Jensen v. Bledsoe*, 100 Idaho 84, 593 P.2d 988, 994 (1979) (quoting 77 Am.Jur.2d Vendor and Purchaser, § 192).

As explained above, the parties did not contract for a specific lot delivery date. As a result, Ricks cannot have breached the provision requiring that unencumbered property be conveyed.

### 2. *Ricks' arguments regarding breach.*

Ricks argues that his performance under the Spur Ranch Agreement is excused because Kastera wrongfully interfered with Ricks' lender relationships, thus hindering Ricks' efforts to obtain a construction loan. In addition, Ricks contends that by deciding not to complete its performance and attempting to deem the contract rescinded, Kastera breached the Spur Ranch Agreement.

■ Ricks' argument that Kastera wrongfully interfered with Ricks' attempt to secure a construction loan for the Spur

Ranch development is not supported in the record. Ricks testified that all he needed in order to secure construction financing to finish the subdivision improvements was some form of written assurance from Kastera that it complete performance per the Spur Ranch Agreement upon completion of construction. Ricks felt Kastera was obligated to provide such assurances under a clause in the Spur Ranch Agreement that provides "each party agrees to sign such other documents as may be reasonably necessary to carry out the intent of this agreement." Ex. 100, ¶ 7.

Kastera argues that the banks that were contemplating extending construction financing to Ricks were not merely seeking assurances that Kastera would close the transaction upon completion, but rather were seeking guarantees from Kastera that any construction loan extended to Ricks would be repaid. Kastera contends that such guarantees, in the form of letters of credit, were not contemplated by the Spur Ranch Agreement, and declined to give them.

In this instance, the Court agrees with Kastera, and concludes that by declining to extend such guarantees Kastera was not in breach of the Spur Ranch Agreement. The parties' agreement did not require Kastera to obtain a letter of credit to guarantee its intention to complete the transaction with Ricks. It was Ricks' obligation to finish the development, not Kastera's, and given the absence of any express provision in the Spur Ranch Agreement, he can not rely upon Kastera's hesitation in helping Ricks acquire financing as a breach.

However, the consequences of the letter dated October 12, 2007 sent by Kastera's counsel to Ricks' counsel is a different matter entirely. In that letter, Kastera informed Ricks that it no longer desired to continue with the parties' relationship. *See* Ex. 120. Kastera demanded

"a full and complete rescission of its agreement with Tom Ricks and a complete return of the $2,231,250 paid to him[,]" along with interest at the statutory rate of 12%. *Id.* Unequivocally, then, this letter represents an absolute, affirmative repudiation by Kastera of any further intention to perform the parties' contract. Although Kastera believed at the time that Ricks had breached the Spur Ranch Agreement by failing to timely deliver completed lots, for the reasons explained above, the Court has ruled otherwise. Therefore, the Court concludes that this letter and Kastera's purported rescission was unjustified and improper, and constituted a breach of the Spur Ranch Agreement.

In summary, then, the Court finds and concludes that the Spur Ranch Agreement is an enforceable contract, and that Kastera breached that contract. Kastera's claim against Ricks to recover the approximate $2.23 million it paid Ricks under this arrangement therefore fails.

## C. Damages resulting from Kastera's breach of the Spur Ranch Agreement.

Kastera breached the Spur Ranch Agreement and, as a result, can not recover the sums it paid to Ricks. But can Ricks recover additional money damages from Kastera on account of its breach?

Ricks bears the burden of proving, with reasonable certainty, that Kastera's breach of the Spur Ranch Agreement caused him to suffer damages, and the amount of those damages. *See Griffith v. Clear Lakes Trout Co.*, 143 Idaho 733, 152 P.3d 604, 611 (2007) ("The burden is upon the plaintiff to prove not only that it was injured, but that its injury was the result of defendant's breach; both amount and causation must be proven with reasonable certainly."). The reasonable certainty standard requires neither absolute assur-

ance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation. *Id.* (citing *Fuller v. Wolters,* 119 Idaho 415, 807 P.2d 633, 640 (1991)). Ultimately, though, it is for the trier of fact—in this action, the Court—to fix the amount of damages by determining the credibility of the witnesses, resolving conflicts in the evidence, and drawing reasonable inferences from that evidence. *Id.* (citing *Sells v. Robinson,* 141 Idaho 767, 118 P.3d 99, 106 (2005)).

It is in this aspect of the action that Ricks' claim against Kastera is weakest. Simply put, the evidence produced at trial by Ricks as to the amount of the damages he suffered when Kastera pulled out of the parties' deal was surely less than compelling. To establish his right to an award of money damages, Ricks relied heavily upon the testimony of Gale Pooley, an expert, who prepared a written report, Ex. 146, and Ricks' own testimony. Neither source of information was persuasive.

In his report, Pooley estimated Ricks' damages resulting from Kastera's breach of the Spur Ranch Agreement at $800,000. As previously indicated, Kastera challenged Pooley's competency, and also objected to admission of the report into evidence. However, in the Court's opinion, Pooley was adequately qualified by education, training, and experience to give expert testimony under Fed.R.Evid. 702. His reports were admissible, in the Court's view, under Fed.R.Evid. 703. Therefore, Kastera's objections to, and requests that the Court exclude, both the Pooley testimony and his reports, Exs. 146 and 147,[24] are denied.

That it was proper for Pooley to testify and render an opinion, however, does not mean that his views were adequate to prove Ricks' alleged claim for damages. Indeed, for the reasons outlined below, while his resume was impressive, Pooley's presentation was lacking, and the Court ascribes almost no weight to Pooley's testimony and these exhibits.

Pooley is, apparently, an appraiser and economist. He is licensed in Idaho as a real estate broker, and holds the MAI designation from the Appraisal Institute. He has college degrees in accounting and economics, and has completed substantial continuing education course work in the field of real estate appraisal. In addition, Pooley has received a so-called "litigation certificate" from the Appraisal Institute and has testified as an expert witness in several Idaho cases in recent years. *See generally,* Ex. 145. At trial, Pooley was fairly articulate, seemed adequately-versed in appraisal techniques, and appeared knowledgeable regarding the Spur Ranch property. However, from the Court's perspective, there were several serious deficiencies in the substance of Pooley's testimony, and his inability to support his opinions with facts renders his calculations of Ricks' damages, in the Court's opinion, quite unreliable.

Pooley's estimate of damages with respect to the Spur Ranch Agreement was comprised of two components: his loss of development profit and his loss in property value. Pooley opined that Ricks lost $385,569 in development profit as a result of Kastera's breach of the Spur Ranch Agreement, and that Ricks' loss in property value at Spur Ranch was $418,622. *See* Ex. 146. Pooley totaled and rounded these figures to arrive at his final estimation of damages resulting from the Spur Ranch Agreement. The Court declines to

---

**24.** Ex. 147 is the appraisal report that pertains to the Other Properties Agreement, which will be addressed later in the decision.

rely upon Pooley's analysis regarding either component of this calculation.

As for Ricks' loss in property value, Pooley explained that because the residential real estate market softened markedly after the Ricks–Kastera Spur Ranch deal was made, the Spur Ranch property significantly decreased in value. According to Pooley, because he lost his "sale" of the development, Ricks should be able to recoup the decline in the value of the property from Kastera as breach damages. To support this theory, Pooley identified a July 3, 2009 appraisal which valued the property as of that date at $795,000.[25] Since Ricks acquired the property for $1,213,622, Pooley opined that the difference which Ricks should be entitled to is $418,622.

The Court disagrees with Pooley's approach on this point. Indeed, if Ricks were to recover both the loss in property value, and any alleged development profits, Ricks would benefit from a clear "double-dip" on damages. Under these facts, in the Court's opinion, to fully compensate Ricks for the benefit of his bargain under the Spur Ranch Agreement in this case, the Court need only look to the first component of Pooley's calculation—Ricks' loss of the profits he would have enjoyed as a result of his development of the property and its sale to Kastera.

To prove that Ricks lost profits on the Spur Ranch deal, Pooley would have to present a detailed analysis of Ricks' cost to acquire the property, together with the development costs, as compared to what Kastera agreed to pay Ricks under the Spur Ranch Agreement. Pooley's presentation concerning Ricks' lost development profits was lacking, however. Of principal concern to the Court in attempting to determine if Ricks had lost development profits was the conspicuous absence in the record of any of the critical data supporting Pooley's fundamental assumptions upon which his calculations were founded. Pooley testified that in making his assumptions, he reviewed on-line data in the real estate multiple listing service ("MLS") to identify comparable developments and properties. Without showing the parties or the Court any of the data from which he worked, he then manipulated and allegedly extrapolated information from these resources based upon his own experience in the market to formulate what he felt were reasonable assumptions for development costs for a residential property.[26] Armed with those assumptions, and after deducting the amount of Kastera's initial payment to Ricks, Pooley opined that Ricks lost $385,569 in potential profits when Kastera declined to follow through with its contract to buy the developed Spur Ranch property from Ricks.

While it was not improper for an expert to consult research and sales data, the information Pooley apparently referred to in the MLS databases that he so heavily relied upon was not included in his report, nor was it otherwise offered into evidence, although Pooley contended that the information was still available and could be viewed by anyone with access to the MLS databases. But the Court, as the fact finder, should not be asked to, and indeed can not properly, do its own research regarding the substance or reliability of the

---

25. This appraisal report was apparently completed by another appraiser. Pooley obtained a copy of the appraisal and reviewed it in connection with preparing his testimony and report in this case. However, the underlying appraisal was never introduced into evidence.

26. In Ex. 146, Pooley projected that the total development costs for the completed 44 lots in Spur Ranch which Kastera was to purchase would have been $1,970,733. Other than by simply trusting Pooley's opinion, the Court can not determine how the witness arrived at this figure.

facts upon which an expert witness has based his opinions. Pooley's summary approach to documenting the basis of his opinions did not allow Kastera or the Court to truly test the reliability of his opinions. When pressed about the lack of supporting data by the Court, Pooley explained that, because he was asked to prepare only a limited, or summary report, the applicable standards of professional appraisal practice did not require him to attach all of the supporting information for his assumptions to the report. While that explanation may render Pooley's opinion and report adequate under professional standards, the deficiencies inherent in that method of presenting courtroom evidence are significant, and as a result, the willingness of the Court to accept Pooley's figures is adversely impacted. Although the Court has no reason to doubt that Pooley consulted some information in the MLS databases and other resources, it must speculate as to the quality, quantity and relevancy of that information. The Court is unwilling to engage in such speculation. Ricks bears the burden of proof on damages, and without this crucial information, the Court has no way to gauge the reliability and reasonableness of Pooley's assumptions regarding development costs.

In an attempt to shore up Pooley's numbers, Ricks, who admittedly has considerable practical experience in real estate development, testified that he felt the assumptions Pooley used were reasonable ones. But without knowing more about the data underpinning Pooley's assumptions, the Court remains unwilling to accept his conclusions, or Ricks' endorsement of them. Without the data, Ricks'

opinion is itself, at best, untestable, and at worst, self-serving speculation.

For these reasons, the Court concludes that Ricks has not carried his burden of proving that he suffered quantifiable money damages as a result of Kastera's breach of the Spur Ranch Agreement. Pooley's reliance on the decline in value of the Spur Ranch property is not appropriate to show damages in this context. Moreover, Pooley's calculations of Ricks' lost profits on this project, without proof of the facts upon which he relied to arrive at his conclusions, renders his opinions unreliable speculation, outside the realm of reasonable certainty. On this record, the Court is unable to award money damages to Ricks based upon Kastera's breach of the Spur Ranch Agreement.[27]

### D. The Other Properties Agreement.

#### 1. *The Nature of the Agreement.*

Much like it did with respect to the Spur Ranch Agreement, Kastera challenges Ricks' ability to recover under the Other Properties Agreement by arguing that the contract is legally unenforceable. To do so, Kastera characterizes the compensation Ricks was to receive under this contract as a commission on the purchase of real property. Because Ricks is not a licensed real estate agent or broker, Kastera contends that the Court may not enforce this "commission agreement" under Idaho law. Once again, the Court declines to adopt Kastera's spin on the nature of the Other Properties Agreement.

Under this arrangement, it is true that the parties contemplated that Ricks, calling upon his prior good relations with them, would approach land owners with

---

27. In his complaint, in addition to seeking an award of money damages, Ricks alleged in the alternative that he is entitled to specific performance of the Spur Ranch Agreement and the Other Properties Agreement. However, at trial and in his post-trial submissions, Ricks focused exclusively on money damages as a remedy for Kastera's breaches. As a result, the Court concludes that Ricks has effectively abandoned his claim to specific performance concerning these agreements.

potential development property in the Eagle area, and then attempt to persuade them to sell their land to Kastera. In this limited sense, Ricks was indeed serving in a role similar to that of a buyer's realtor. However, the Other Properties Agreement was much broader. After Kastera successfully acquired land from one of the owners targeted by the Other Properties Agreement, Ricks was given the duty (or right, depending upon perspective) to supervise the development of the property into home sites so that Kastera would have a location for the houses it would build. To compensate Ricks for his development efforts, Kastera agreed to pay Ricks a percentage of the profits from these ventures.

In the Court's view, the Other Properties Agreement envisioned something akin to a joint venture. Kastera was not interested merely in retaining Ricks to find land to acquire. Ricks, in turn, sought more than a "finder's fee" and wanted an opportunity to use his skill, and Kastera's capital, to develop property for home sales. Ricks' compensation is not analogous to a commission on the sale of the property; instead, his compensation, in the form of a share of profits, was intended to reward him for his efforts in locating land and completing a successful development. When the parties' goals are seen in this fashion, Kastera's attempt to focus the Court on Idaho real estate licensing law completely misses the mark.

 Nonetheless, the Court has considered the licensing statutes which Kastera now insists should invalidate the agreement. Specifically, Kastera directs the Court to Idaho Code §§ 54–2002 and 54–2065. The former provides, in pertinent part:

No person shall engage in the business or act in the capacity of real estate broker or real estate salesperson in this state without an active Idaho real estate license therefore. Unless exempted from this chapter, any single act described within the definitions of "real estate broker" or "real estate salesperson" shall be sufficient to constitute "engaging in the business" within the meaning of this chapter.

Idaho Code § 54–2002. The other statute provides that any person acting as a real estate broker or salesperson, within the meaning of the Idaho real estate license laws and without the appropriate licenses, may be subject to civil and criminal penalties, including fines and imprisonment in the discretion of the court. Idaho Code § 54–2065. Kastera argues that together, these provisions effectively thwart Ricks' attempt to recover anything from Kastera under the Other Properties Agreement.

In its haste to now find fault with Ricks' actions and with the Other Properties Agreement, Kastera overlooks a key element of the statutes—the exceptions to licensure. Idaho Code § 54–2003(1)(b) provides that "an Idaho real estate license is not required for . . . [the] acquisition, exchange or other disposition of any interest in real property or business opportunity by its owner or a regular employee of the owner, acting within the scope of his or her employment[.]". Although Ricks may not have been a Kastera employee in the traditional sense, he was undoubtedly affiliated with Kastera with respect to these ventures, and his actions were certainly within the scope of the parties' business arrangement. Since they were acting in concert under a joint venture, no license was required for Ricks to link prospective sellers with Kastera.

 However, even if this exception does not apply under these facts, Kastera has not shown how the licensure statutes would invalidate the Other Properties Agreement. Like the statutes and city ordinances analyzed earlier with respect to the Spur Ranch Agreement, these licens-

ing statutes provide penalties for acting in the capacity of a broker or salesperson without a license; but, the statutes fail to evidence an intent on the part of the state legislature to void contracts which may be in contravention of their terms. *See Farrell v. Whiteman*, 146 Idaho 604, 200 P.3d 1153, 1158 (2009) (Holding that since "the consequences of a court finding a contract to be illegal are harsh, only those contracts which involve consideration that is *expressly* prohibited by the relevant prohibitory statute are void."). Thus, consistent with the conclusions reached by the Court above regarding the Spur Ranch Agreement, the Court also declines to conclude that the Other Properties Agreement is unenforceable due to an apparent conflict with Idaho real estate licensure laws. *Compare Cox*, 639 P.2d at 20 (concluding that the parties' contract should not be invalided for failure to comply with Idaho Code § 50–1316).

In the absence of some other legal defense, the Court concludes that the Other Properties Agreement is valid and enforceable, and focuses its attention on whether it was breached.

### 2. *The Other Properties Agreement was Breached by Kastera.*

■ Ricks argues that Kastera breached the Other Properties Agreement by rescinding it, thereby usurping Ricks' opportunity to develop the properties acquired by Kastera that were subject to the agreement.

Ricks argues that the October 12, 2007 letter sent by Kastera's counsel to Ricks' counsel purported to cancel not only the Spur Ranch Agreement, but all agreements contemplated by the parties, including the Other Properties Agreement. While that letter, like the other documents in this case, is not the model of clarity, the Court agrees with Ricks that it was intended to put an end to all of the agreements made between the parties. Al-

though the bulk of the letter describes the circumstances surrounding the Spur Ranch development, the final few paragraphs reference the cash advances which Kastera had been making to Ricks and his son. These monthly advances were not made under the Spur Ranch Agreement, but rather were paid to Ricks and his son pursuant to the specific terms of the Other Properties Agreement. In the final paragraph of the rescission letter, Kastera's lawyer indicates that these advances will be discontinued. Moreover, the general tone of the letter clearly evidences Kastera's intent to sever all ties with Ricks. For these reasons, the Court finds that by sending the letter to Ricks' counsel, Kastera effectively terminated the parties' relationship and thereby breached the Other Properties Agreement.

■ Even if the Court is incorrect with respect to the meaning of the Kastera letter, the evidence shows that, in fact, Kastera did not permit Ricks to develop the property it acquired under, and as contemplated by, the Other Properties Agreement. The agreement explicitly provided that Ricks would be in charge of developing all properties Kastera acquired subject to the agreement, either under his own name, or under a company name, for Kastera. *See* Ex. 129. However, the evidence showed that over time, after the parties inked the Other Properties Agreement, Kastera began to venture into land development on it own in addition to house construction, and many of the development responsibilities were delegated to Kastera's internal staff under the supervision of Wayne Forrey, rather than to Ricks. By depriving Ricks of the opportunity to develop the property, Kastera breached the Other Properties Agreement.

### 3. *Proof of Damages.*

■ Again, for Ricks, the difficult aspect of his claim for breach of the Other

Properties Agreement concerns proof of those damages he may have suffered. In his closing argument, Ricks elected not to pursue his damage claims previously asserted against Kastera with respect to the Thornton and Gabica properties, for $1,430,000 and $250,000, respectively. However, Ricks maintains his claim against Kastera for damages relating to the Purdy and Cleaver properties, in the amounts of $2,800,000 and $1,100,000, respectively. *See* Ricks' Closing Argument, Docket No. 58. To support these claims, Ricks relies heavily on the appraisal report prepared by Pooley, Ex. 147.

By tying his fortunes to Pooley's report, Ricks' proof suffers from the same deficiencies discussed above in relation to the Spur Ranch property. In particular, and again, Pooley has produced none of the data from the MLS databases upon which he relied in reaching his conclusions. Without this information the Court cannot properly determine whether Pooley's many, critical assumptions regarding development costs and future sales prices were reasonable. For this reason, the Court concludes that Ricks has not proven with reasonable certainty what losses he suffered as a result of Kastera's breach of the Other Properties Agreement. Accordingly, no damages are awarded to Ricks for Kastera's breach of the Other Properties Agreement.[28]

### E. Kastera's Unjust Enrichment Claim.

In the alternative to its breach claim, Kastera alleges that Ricks has been unjustly enriched by his retention of over $2.23 million which Kastera paid to him. Kastera contends that, under the circumstances, it would be inequitable for Ricks to have the benefit of that money. Kastera's argument lacks merit.

"Unjust enrichment occurs where a defendant receives a benefit which would be inequitable to retain without compensating the plaintiff to the extent that retention is unjust." *Vanderford Co. v. Knudson*, 144 Idaho 547, 165 P.3d 261, 271 (2007) (citing *Beco Constr. Co. v. Bannock Paving Co.*, 118 Idaho 463, 797 P.2d 863, 866 (1990)). However, the doctrine is not available where there is an enforceable contract between the parties which covers the same subject matter. *Id.* at 272 (citing *Wilhelm v. Johnston*, 136 Idaho 145, 30 P.3d 300, 307 (Idaho Ct.App.2001)). "Equity does not intervene when an express contract prescribes the right to compensation." *Id.* (citing *Shacocass, Inc. v. Arrington Constr. Co.*, 116 Idaho 460, 776 P.2d 469, 473 (Idaho Ct.App.1989)).

In this case, Kastera paid Ricks as an advance of sums due to him under the Spur Ranch Agreement. While Kastera disagrees, the Court has previously concluded that the Spur Ranch Agreement was valid and enforceable. The mere existence of this contract bars Kastera's equitable claim for unjust enrichment. *See Vanderford*, 165 P.3d at 272.

But, of course, in order to recover for unjust enrichment, Kastera must prove it would be inequitable for Ricks to retain the funds it paid to him. Kastera has done no such thing. As explained above, it was

---

**28.** In his complaint, in addition to damages, Ricks also sought an accounting from Kastera for the parties' alleged joint venture, and recovery of unspecified lost "business opportunities" which Kastera allegedly usurped from Ricks. However, like his claim for specific performance of the agreements, Ricks' evidence and post-trial arguments do not mention his need for an accounting, and instead focused exclusively on recovering money damages as Ricks' sole remedy for Kastera's actions. As such, the Court concludes that Ricks has abandoned his claim for an accounting from Kastera.

Kastera, and not Ricks, that breached the parties' agreements and, arguably, engaged in the improper conduct. In contrast, although his performance had been significantly delayed by the circumstances, Ricks had performed his obligations through the time that Kastera rescinded the agreement. Although Ricks failed to prove with the requisite certainty the amount of his damages to support an award by the Court, the fact remains that he was likely prejudiced by Kastera's breaches.

Simply stated, the equities do not favor Kastera, and it has shown no basis for any unjust enrichment claim against Ricks.

### F. Rick's Objection to Kastera's Proof of Claim.

Kastera filed its proof of claim in Ricks' bankruptcy case alleging it was owed over $3,000,000 on account of Ricks' breaches of the parties' contracts. In his complaint, Ricks objected to the proof of claim, contending that he owed no debt to Kastera. Having previously concluded that Ricks did not breach the parties' contracts, while Kastera did break its promise to Ricks, the Court concludes that Ricks is correct, and no debt is owed by Ricks to Kastera. Because Kastera's claims against Ricks are not valid under applicable state law, its proof of claim can not be allowed in the bankruptcy case. *See* § 502(b)(1) (providing that a claim should be disallowed if it is unenforceable against the debtor under applicable law). Therefore, Ricks' objection to Kastera's proof of claim should be sustained, and the claim disallowed for purposes of any distributions in Ricks' bankruptcy case.

### IV.

### Conclusion

As explained above, the Court concludes that both the Spur Ranch Agreement and the Other Properties Agreement are valid and enforceable contracts. Through its actions, Kastera breached both agreements. However, owing to a lack of adequate proof, Ricks has not shown with reasonable certainty the amount of his damages resulting from those breaches, and therefore no damages are awarded by the Court.

Kastera's counterclaims against Ricks for various contractual breaches and unjust enrichment lack merit and will be dismissed.

Ricks owes no debt to Kastera as a result of these transactions. Therefore, Kastera's proof of claim which was filed in Ricks' bankruptcy case will be disallowed.

A separate judgment will be entered.